74 U.S. 152 (____)
7 Wall. 152
THE SIREN.
Supreme Court of United States.

*153 Mr. Ashton, Assistant Attorney-General of the United States.
Mr. Causten Browne, Contra.
Mr. Justice FIELD delivered the opinion of the court.
It is a familiar doctrine of the common law, that the *154 sovereign cannot be sued in his own courts without his consent. The doctrine rests upon reasons of public policy; the inconvenience and danger which would follow from any different rule. It is obvious that the public service would be hindered, and the public safety endangered, if the supreme authority could be subjected to suit at the instance of every citizen, and consequently controlled in the use and disposition of the means required for the proper administration of the government. The exemption from direct suit is, therefore, without exception. This doctrine of the common law is equally applicable to the supreme authority of the nation, the United States. They cannot be subjected to legal proceedings at law or in equity without their consent; and whoever institutes such proceedings must bring his case within the authority of some act of Congress. Such is the language of this court in United States v. Clarke.[*]
The same exemption from judicial process extends to the property of the United States, and for the same reasons. As justly observed by the learned judge who tried this case, there is no distinction between suits against the government directly, and suits against its property.
But although direct suits cannot be maintained against the United States, or against their property, yet, when the United States institute a suit, they waive their exemption so far as to allow a presentation by the defendant of set-offs, legal and equitable, to the extent of the demand made or property claimed, and when they proceed in rem, they open to consideration all claims and equities in regard to the property libelled. They then stand in such proceedings, with reference to the rights of defendants or claimants, precisely as private suitors, except that they are exempt from costs and from affirmative relief against them, beyond the demand or property in controversy. In United States v. Ringgold,[] a claim of the defendant was allowed as a set-off to the demand of the government. "No direct suit," said the court, "can be maintained against the United States. *155 But when an action is brought by the United States to recover moneys in the hands of a party who has a legal claim against them, it would be a very rigid principle to deny to him the right of setting up such claim in a court of justice, and turn him round to an application to Congress." So in United States v. Macdaniel,[*] to which reference is made in the case cited, the defendant was allowed to set off against the demand of the government a claim for services as agent for the payment of the navy pension fund, to which the court held he was equitably entitled. The question, said the court, was, whether the defendant should surrender the money which happened to be in his hands, and then petition Congress on the subject; and it was held that the government had no right, legal or equitable, to the money.
For the damages occasioned by collision of vessels at sea a claim is created against the vessel in fault, in favor of the injured party. This claim may be enforced in the admiralty by a proceeding in rem, except where the vessel is the property of the United States. In such case the claim exists equally as if the vessel belonged to a private citizen, but for reasons of public policy, already stated, cannot be enforced by direct proceedings against the vessel. It stands, in that respect, like a claim against the government, incapable of enforcement without its consent, and unavailable for any purpose.
In England, when the damage is inflicted by a vessel belonging to the crown, it was formerly held that the remedy must be sought against the officer in command of the offending ship. But the present practice is to file a libel in rem, upon which the court directs the registrar to write to the lords of the admiralty requesting an appearance on behalf of the crown  which is generally given  when the subsequent proceedings to decree are conducted as in other cases.[] In the case of The Athol,[] the court refused to issue a monition to the lords of the admiralty to appear in a suit for damage by collision, occasioned to a vessel by a ship of *156 the crown; but the lords having subsequently directed an appearance to be entered, the court proceeded with the case, and awarded damages. As no warrant issues in these cases for the arrest of the vessels of the crown, and no bail is given on the appearance, it is insisted that they are brought simply to ascertain the extent of the damages, and that the decrees are little more than awards, so far as the government is concerned. This may be the only result of the suits, but they are instituted and conducted on the hypothesis that claims against the offending vessels are created by the collision.[*] The vessels are not arrested and taken into custody by the marshal, for the reasons of public policy already stated, and for the further reason that it is to be presumed that the government will at once satisfy a decree rendered by its own tribunals in a case in which it has voluntarily appeared.
It is true, that in case of damage committed by a public vessel a legal responsibility attaches to the actual wrongdoer, the commanding officer of the offending ship, and the injured party may seek redress against him; but this is not inconsistent with the existence of a claim against the vessel itself. In the case of The Athol, already referred to, where the liability of the actual wrongdoer is asserted, damages against the vessel were pronounced after an appearance on behalf of the crown had been given by the admiralty proctor.[]
The inability to enforce the claim against the vessel is not inconsistent with its existence.
Seamen's wages constitute preferred claims, under the maritime law, upon all vessels; yet they cannot be enforced against a vessel of the nation, or a vessel employed in its service. In a case before the Admiralty Court of Pennsylvania, in 1781, it was adjudged, on a plea to the jurisdiction, that mariners enlisting on board a ship of war belonging to a sovereign independent State could not libel the ship for their wages.
*157 In a case in the English Admiralty Court, a libel having been filed to enforce a claim for seamen's wages against a packet ship employed in the service of the General Post Office, Sir William Scott declined to take jurisdiction until notice was given to the Post Office Department, and he was informed that no objection was taken to the proceeding.[*] The fact that the court took jurisdiction when the exemption, upon which the government could insist, was waived, shows that a claim against the vessel existed, as only upon its existence could the libel in any event be sustained.
Even where claims are made liens upon property by statute, they cannot be enforced by direct suit, if the property subsequently vest in the government. Thus in Massachusetts the statutes provide, that any person to whom money is due for labor and materials furnished in the construction of a vessel in that commonwealth, shall have a lien upon her, which shall be preferred to all other liens except mariners' wages, and shall continue until the debt is paid, unless lost by a failure to comply with certain specified conditions; yet in a recent case, where a vessel subject to a lien of this character was transferred to the United States, it was held that the lien could not be enforced in the courts of that State. The decision was placed upon the general exemption of the government and its property from legal process.[]
So also express contract liens upon the property of the United States are incapable of enforcement. A mortgage upon property, the title to which had subsequently passed to the United States, would be in the same position as a claim against a vessel of the government, incapable of enforcement by legal proceedings. The United States, possessing the fee, would be an indispensable party to any suit to foreclose the equity of redemption, or to obtain a sale of the premises. In Lutwich v. The Attorney-General, a case cited by Lord Hardwicke in deciding Reeve v. Attorney-General,[] a bill was filed to foreclose a mortgage after the mortgagor *158 had been attainted for high treason, and the court refused a foreclosure against the crown, but directed that the mortgagee should hold and enjoy the mortgaged premises until the crown thought proper to redeem the estate.
In Hodge v. Attorney-General,[*] the deeds of certain leasehold estates had been deposited by one Bailey with the plaintiffs, who were bankers, to secure a balance of a running account between him and them. Bailey was afterwards convicted of felony, and the leasehold estates vested in the crown. At the time of his conviction he was indebted to the plaintiffs, who filed a bill against the attorney-general, claiming to be equitable mortgagees of the leasehold estates, to subject the property to sale, and the application of the proceeds to the payment of the amount due them. But the court said that the only decree which could be made in the case was to declare the plaintiffs to be equitable mortgagees of the property, to direct an account to be taken, and that the plaintiffs hold possession of the property until their lien was satisfied. "I do not think," said Baron Alderson, in giving the decision, "that I have any jurisdiction in this case to order a sale. Here the legal estate is vested in the crown; and I do not know any process by which this court can compel the crown to convey that legal estate."
In this country, where, as a general rule, a mortgage is treated only as a lien or incumbrance, and the mortgagor retains possession of the premises, the relief granted in the two cases cited would be of no avail.
The authorities to which we have referred are sufficient to show that the existence of a claim, and even of a lien upon property, is not always dependent upon the ability of the holder to enforce it by legal proceedings. A claim or lien existing and continuing will be enforced by the courts whenever the property upon which it lies becomes subject to their jurisdiction and control. Then the rights and interests of all parties will be respected and maintained. Thus, if the government, having the title to land subject to the *159 mortgage of the previous owner, should transfer the property, the jurisdiction of the court to enforce the lien would at once attach, as it existed before the acquisition of the property by the government.
So if property belonging to the government, upon which claims exist, is sold upon judicial decree, and the proceeds are paid into the registry, the court would have jurisdiction to direct the claims to be satisfied out of them. Such decree of sale could only be made upon application of the government, and by its appearance in court, as we have already said, it waives its exemption and submits to the application of the same principles by which justice is administered between private suitors.
Now, it is a settled principle of admiralty law, that all maritime claims upon the vessel extend equally to the proceeds arising from its sale, and are to be satisfied out of them. Assuming, therefore, that the Siren was in fault, and that by the tort she committed a claim was created against her, we do not perceive any just ground for refusing its satisfaction out of the proceeds of her sale. The government is the actor in the suit for her condemnation. It asks for her sale, and the proceeds coming into the registry of the court, come affected with all the claims which existed upon the vessel created subsequent to her capture. There is no authority, that we are aware of, which would exempt them under these circumstances, because of the exemption of the government from a direct proceeding in rem against the vessel whilst in its custody.
This doctrine was applied by this court in the case of the St. Jago de Cuba,[*] where a libel was filed by the United States to forfeit the vessel for violation of the laws prohibiting the slave trade. Claims of seamen for wages, and of material-men for supplies, when the parties were ignorant of the illegal voyage of the vessel, were allowed and paid out of the proceeds. These claims arose subsequent to the illegal acts which created the forfeiture, yet they were not *160 superseded by the claim of the government. "In case of wreck and salvage," said the court, "it is unquestionable that the forfeiture would be superseded; and we see no ground on which to preclude any other maritime claim fairly and honestly acquired." This language, though used with reference to claims arising out of contract, may be applied to claims arising out of torts committed after the capture of the offending vessel.
In United States v. Wilder[*] it was held that goods of the United States were subject to contribution equally with goods of private shippers, to meet the expenses incurred in saving them, which were averaged, and that the owners of the vessel could retain the goods, until their share of the contribution to the average was paid or secured. The United States claimed the right to take the goods without paying or securing this share; and this being denied, the action was brought to recover their value. In delivering the opinion, Mr. Justice Story stated that he was unable to distinguish the case from one of salvage, and that it had never been doubted that in cases of salvage of private ships and cargoes, the freight on board belonging to the government was equally subject to the admiralty process in rem for its proportion due for salvage with that of mere private shippers; but that it might be, for aught he knew, different in cases of the salvage of public ships. "The same reasoning, however," continued the learned justice, "which has been applied by the government against the lien for general average, applies with equal force against the lien for salvage of government property under all circumstances. Besides, it is by no means true, that liens existing on particular things are displaced by the government becoming, or succeeding to the proprietary interest. The lien of seamen's wages and of bottomry bonds exists in all cases as much against the government, becoming proprietors by way of purchase, or forfeiture, or otherwise, as it does against the particular things in the possession of a private person."
*161 In the case of The Schooner Davis and Cargo, recently decided in the Circuit Court of the United States for the Southern District of New York, cotton belonging to the United States was held liable to contribution to meet the allowance made for salvage services in saving vessel and cargo. "The mere fact," said the court, "of the ownership of the cotton by the government, in the act of being carried to its port of destination for the purposes of a market as merchandise, we think did not exempt it from the lien in case of salvage service. We shall not enter into an argument in support of the position, as the subject, or rather a kindred one  the liability of property of the government for general average  and the present question incidentally have been already most elaborately examined by Mr. Justice Story.[*] We are inclined, also, to the opinion, that it is the doctrine of the admiralty in England,[] and of the most approved modern elementary writers on the subject in this country."[]
There is no just foundation for the objection that claims for maritime torts cannot be dealt with and adjusted by a prize court. "It is a principle well settled, and constantly conceded and applied," said Chancellor Kent, "that prize courts have exclusive jurisdiction and an enlarged discretion as to the allowance of freight, damages, expenses, and costs in all cases of captures, and as to all torts, and personal injuries, and ill-treatments, and abuse of power connected with captures jure belli; and the courts will frequently award large and liberal damages in those cases."[§] The jurisdiction is not, therefore, limited to the determination of the simple question of prize or no prize. But whatever may be the limitation upon the jurisdiction of a prize court in England, there is no such limitation upon the District Court sitting as a prize court in this country. Here, the District Court, as was said in United States v. Weed,[] "holds both its *162 prize jurisdiction and its jurisdiction as an instance court of admiralty from the Constitution and the acts of Congress, and is but one court with these different branches of admiralty jurisdiction, as well as cognizance of other and distinct subjects." It may, therefore, hear and determine all questions respecting claims arising after the capture of the vessel. Outstanding claims upon the vessel, existing previous to the capture, cannot be considered. This exclusion rests not on the ground of any supposed inability of the court to pass upon these claims correctly, but because they are superseded by the capture.[*]
As to the suggestion that a maritime tort, committed by a ship in possession of a prize master and crew, ought not to create a claim on the vessel against a neutral owner in case the vessel is restored, it is sufficient to say, although the vessel having been condemned the question is not of importance in this case, that the claim in that event, if held to exist, would not be the subject of consideration by the prize court. Here, however, the title was divested from the previous owner by the capture, that being lawful, and vested in the United States (in trust as to one-half for the captors), although the legality of the capture was not established until the sentence of condemnation.
It does not appear that the court below considered the evidence as to the character and extent of the alleged tort. It appears to have placed its decision entirely upon the legal proposition, that the captured vessel was exempt from legal process at the suit of the intervenors, and that consequently the proceeds of the vessel could not be subjected to the satisfaction of their claims. We have, however, looked into the evidence, and are satisfied that the collision was the fault of the Siren. It took place in the daytime. The sloop was seen from the steamer in time to avoid her. The steamer was out of the regular track for steamers passing through Hurlgate. The passage is noted for its difficulties and dangers, *163 and, under the laws of New York, pilots are specially commissioned to take vessels through it. The prize master engaged a pilot for the Sound to take the steamer from New York to Boston, but refused to engage a Hurlgate pilot, his reason being to avoid expense. With such a pilot she would have been taken in the regular track of steamers northward of Blackwell's Island, and so close to Flood Rock as to avoid the sloop, as might easily have been done. We do not think it important to cite from the evidence in vindication of our conclusion, especially as it was not seriously contested on the argument that the Siren was responsible for the collision.
The decree must be REVERSED, and the cause remanded to the court below, with directions to assess the damages and pay them out of the proceeds of the vessel before distribution to the captors.
ORDERED ACCORDINGLY.
Mr. Justice NELSON, dissenting.
I am unable to concur in the opinion just delivered. The steamer Siren, having been captured by the United States steamship Gladiolus, a government vessel of war, jure belli, became the property of the United States, subject only to the right of the claimant to have the question of the legality of the capture determined by the prize court to which it was sent for condemnation. Captures made by government vessels belong to the government, and no title exists in the captors, except to their distributive shares of the proceeds after condemnation.[*]
I agree that the Siren, while on her way, after capture, under the charge of the prize master, was in fault in the collision with the sloop Harper, on her passage from the East River into the Sound, and that, if she had belonged to a private owner, she would have been liable, in the admiralty, for all the damages consequent upon this fault. Nor do I make any question as to a lien for the damages against the *164 vessel in such a case, and which may be enforced by a proceeding in rem; or may be by a petition to the court against the proceeds, in the registry, if, for any cause, the offending vessel has been sold, and no prior lien exists against these proceeds. But if the owner of the offending vessel is not liable at all for the collision, it follows, as a necessary legal consequence, that there can be no lien, otherwise the non liability would amount to nothing. It would be idle to say that the owner was not liable for the wrong, and at the same time subject his vessel for the damages occasioned. In this case, therefore, before a lien can be established or enforced against the Siren by a proceeding in rem, for the fault in question, or, which is the same thing, before it can be applied to the proceeds of the vessel in the registry, it must first be shown that the United States, the owner, is legally liable for the collision. In saying legally liable, I do not mean thereby legally liable to a suit; but legally liable upon common law principles in case a suit might have been maintained against the government; in other words, legally liable for the wrongful acts of her officers or public agents. That, in my judgment, is the turning-point in this case, and the principle is as applicable to the proceeds of the Siren in the registry as to the vessel itself. If the government is not responsible, upon the principles of the common law, for wrongs committed by her officers or agents, then, whether the proceedings in the admiralty are against the vessel, or its proceeds, the court is bound to dismiss them.
Now, no principle at common law is better settled than that the government is not liable for the wrongful acts of her public agents. Judge Story, in his work on Agency, states it as follows: "It is plain," he observes, "that the government itself is not responsible for the misfeasances, or wrongs, or negligences, or omissions of duty of the subordinate officers or agents employed in the public service; for it does not undertake to guarantee to any persons the fidelity of any of the officers or agents whom it employs, since that would involve it in all its operations in endless embarrassments, and difficulties, and losses, which would be subversive *165 of the public interests." When we take into view the multitude of public officers and agents, which the government is obliged to employ in conducting its affairs, the soundness, propriety, and even necessity of this principle become at once apparent. In our judgment the present case falls directly within it. In all these cases of wrongs committed by public officers or agents, the legal responsibility attaches to the actual wrongdoer.
It is supposed that the liability of government property for salvage or general average contribution, for services or sacrifices, in cases of impending danger to the property, afford some authority for the judgment in the present case. We are unable to perceive any analogy to the principle we have been discussing. There a portion of the property is taken, or appropriated, as a compensation for saving it from a peril that threatened the loss of the whole. The cases involve no principle concerning the liability of the government for the tortious acts of its public officers.
Great stress is laid also upon the circumstance that the United States is the libellant, and has brought the offending vessel or its proceeds into court, and that the proceeding against the fund in the registry is not a suit against the government. But the answer to this is not that the proceeding may not be taken against the fund in the registry, although there is certainly some difficulty in distinguishing between that and a proceeding against the vessel itself, but that the fund which belongs to the government is not liable at all for the wrongful acts of its officers, which wrongful acts lie at the foundation of the judgment rendered in the case. It is for this principle I contend, and for which I am compelled to dissent from the judgment.
NOTES
[*] 8 Peters, 444.
[] 8 Ib. 150.
[*] 7 Peters, 16.
[] Coote's New Admiralty Practice, 31.
[] 1 W. Robinson, 382.
[*] The Clara, 1 Swabey, 3; and the Swallow, Ib. 30.
[] See, also, United States v. Brig Malek Adhel, 2 Howard, 233.
[*] The Lord Hobart, 2 Dodson, 103.
[] Briggs and another v. Light Boats, 11 Allen, 157.
[] 2 Atkyns, 223.
[*] 3 Younge & Collyer, 342.
[*] 9 Wheaton, 409.
[*] 3 Sumner, 308.
[*] 3 Sumner, 308.
[] 3 Haggard, 246.
[] 1 Parsons's Maritime Law, 324; 2 Ib. 625; Marvin on Wrecks and Salvage, § 122; see, also, 7 Wheaton, 283.
[§] 1 Kent, 354.
[] 5 Wallace, 69.
[*] The Battle, 6 Wallace, 498; The Hampton, 5 Ib. 372; and The Frances, 8 Cranch, 418.
[*] Dos Hermanos, 10 Wheaton, 306; The Aigburth, Blatchford's Prize Cases, 635; The Adventure, 8 Cranch, 226.