## THE COLUMBUS.

### THE SCOWS NOS. 6, 8, 11, and 12.

### MUNN v. GARVER.

(Circuit Court of Appeals, Third Circuit. May 3, 1895.)

### No. 9.

1. MARITIME LIENS—TOWAGE SERVICES RENDERED UNDER CONTRACT — EXISTENCE OF LIEN.

Where a libel against certain scows and dredges, constituting together a dredging plant, to recover for towage services rendered during the operation of the plant, showed that the services were rendered under contract made with a person with whom the libelant dealt as agent for the owners or users of the plant, without any agreement for a lien, *held*, that an averment in the libel that the services were rendered on the credit of the plant, and not upon the credit of the owners, was insufficient in law, because the material inquiry was, not whether the libelant himself contemplated a lien, but whether a lien was created by or resulted from the mutual understanding of the parties and the services rendered in pursuance of it; and *held*, further, that, as the services were not alleged to have been rendered upon the request of the master, but under contract with an agent of the owners, it was immaterial, under the circumstances, whether or not the owners were known to libelant.

2. SAME.

Where special and unusual towage services, such as conveying the scows of a dredging plant back and forth from the dredges to the dumping place, and moving the dredges from time to time, are rendered pursuant to a contract, any intention to create a lien for the services should be clearly expressed.

3. SAME.

Dredges and scows used together upon a dredging contract, both being necessary to the operation of the dredging plant, are not to be considered as one thing, in such sense that a lien will attach to all for services rendered in towing some of the scows back and forth from the dredges to the dumping place, and in moving the dredges from time to time. 65 Fed. 430, affirmed.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

This was a libel by Frank W. Munn, managing owner of the tugboats Philadelphia and Alert, against the dredge Columbus and the scows Nos. 6, 8, 11, and 12, of which John A. Garver was claimant, as agent for the owners. In the district court the libel was dismissed. 65 Fed. 430. The libelant appeals.

Horace L. Cheyney and John F. Lewis, for appellant.

J. Rodman Paul, for appellee.

Before ACHESON and DALLAS, Circuit Judges, and BUFFINGTON, District Judge.

DALLAS, Circuit Judge.    This is an appeal from a decree in admiralty.    The libel was filed against three dredges and twelve mud scows, characterized as "forming together a mud-dredging plant"; and of these there were attached one dredge and four scows.    The libelant sought to hold the latter jointly liable for towage rendered by two tugs to any and all the scows and dredges, upon the ground "that the services of the said tugs were rendered to all the dredges and scows constituting the plant of said dredging company as such services were needed by those operating the· plant, and that the services were rendered to the plant as a whole, and were necessary for operating the same properly, and that the services were rendered on the credit of said plant, and not on the credit of the owners thereof, who are unknown to the libelant," etc.

The case was heard below and in this court upon an agreed statement of facts, as follows:

"The libelant is part owner and managing owner of the tugs Philadelphia and Alert.  In the year 1891, James A. Mundy & Co. entered into a contract with the United States for the removal of Windmill and other islands in the Delaware river, opposite Philadelphia, and for the deposit of the material removed therefrom upon League Island.  To carry out this work, James A. Mundy and others organized under the laws of the state of New Jersey a corporation known as the 'Philadelphia Dredging Company,' and this dredging company, or James A. Mundy and others associated with him, purchased and secured a dredging plant,—i. e. a number of dredges, scows, and towboats,—to be used in the same operation of dredging for the prosecution of the work of the removal of these islands.  This plant was made up of two dredging plants, one known as the 'Philadelphia Plant,' and the other as the 'Thompson Plant.'  The Philadelphia dredging plant consisted of the dredge Starbuck and three bottom-dumping scows, Nos. 13, 14, and 15.  The Thompson plant consisted of the dredges Columbus, America, and Norwalk, and the tug Bowen, and the scows Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12.  These two plants were used· and operated as one by the Philadelphia Dredging Company.  The dredges above mentioned were anchored at the islands which were to be removed, and, as the earth was excavated, it was deposited upon the scows by the dredges in the manner usual in dredging operations.  By the contract with the United States government, the material excavated from the islands was required to be deposited upon League Island, at a distance of about six miles from the scene of the dredging operation, and, to receive the excavated material, the above-mentioned scows were employed.  They were bottom-dumping scows, constructed in the usual manner, and lacked any facilities whatever for propulsion, either steam or sail, or for steering, and it therefore became necessary to supply additional tugboats to tow the loaded scows down the river to League Island, and the empty scows back to the dredges to be refilled.  In 1892 the Philadelphia Dredging Company, or James A. Mundy and those operating and owning the ·said plants, entered into an arrangement with libelant for the towage of the scows from the dredges to League Island and back, and for such moving of the dredges as might be necessary, and agreed to pay the sum of $26 per day for the tug Philadelphia, and $30 per day for the tug Alert.  During the months of July and August, 1892, the tug Philadelphia rendered said towage service properly for 30 days,—during November 26 days, and during December 20 days,—for which the sum of $2,054 became due to libelant.  During July, 1892, the tug Alert rendered said towage services properly for 4 nights, at $30 per night, and 4½ hours' time, at $4 per hour, for which the sum of $138 became- due to libelant.  The dredges above named were not supplied with any mud pockets or dumps except the said scows, and had no means of propulsion, and, in order to be used as dredges, were required to be operated in conjunction with one or. more scows, as was done in this case to receive the mud dredges, and were required to be advanced or moved from time to

time as the dredging work progressed. The dredges excavated the earth, and deposited it on the bottom-dumping scows. After the scows were loaded, they were, either singly or more usually in a tow consisting of several, towed down the river to League Island, and were there dumped over the receiver of the mud pump, the light scows being towed back to the dredge to be reloaded, the round trip occupying about three-quarters of a day. The said towage services were necessary to enable the work of dredging to be carried on, as without the use of the scows to carry the excavated material the dredges would have been useless for this work, and the scows would have been of no use for this work without the services of the dredges. The scows bore no name, but were known by numbers only. When brought back empty, the various scows were towed to the dredges to be filled, in accordance with the directions of the superintendents in charge of the dredging work. No itemized account of the towing of the dredges or of each scow to and from each dredge or the towage of the dredges was kept by the tugs. This suit was brought by libelant against the dredges Columbus, America, and Starbuck and the scows Nos. 1, 2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 13, and 14, and of these the marshal attached the dredge Columbus and scows 6, 8, 11, and 12. The dredges and scows against which the suit was brought were the only ones within the jurisdiction of the court at that time."

Two questions are presented by the pleadings and the statement of facts:

1. The libel states that the dredges and scows constituted the plant of the Philadelphia Dredging Company, and alleges that that company used them, and that "the libelant, at the request of the agent of said company, furnished the tugboats." It is also alleged "that the said services were rendered on the credit of said plant, and not on the credit of the owners thereof, who are unknown to the libelant," etc. But this latter averment is, in our opinion, when considered in connection with the specific statements to which we have referred, insufficient in law; for the material inquiry is, not whether the libelant himself may have contemplated a claim of lien, but whether a lien was created by or resulted from the mutual understanding of the parties and the services rendered in pursuance of it. Nor is it of legal consequence that the libelant does not now know who are the owners of the dredges and scows; for he does not assert that the services were rendered upon the order of the master, but admits that they were rendered under contract with a person with whom he dealt as agent for the owners or users of the vessels, and with whom he made no agreement for lien. If, however, it could be conceded that the libel sufficiently alleged that credit had been given to the vessels, and not to the owners or users thereof, still the issue raised by the answer would have to be determined in favor of the respondents. The admitted fact is that "the Philadelphia Dredging Company, or James A. Mundy and those operating and owning the said plants, entered into an arrangement with the libelant for the towage of the scows from the dredges to League Island and back"; and this admission, we think, constrains the conclusion, not only that the arrangement was made on behalf of owners, and not of vessels, but also that, as matter of fact, the libelant entered into and acted upon it in exclusive reliance on the credit of the owners. The contract was not for ordinary towage, but for special and unusual towage; and we believe that, if it had been intended to create a lien, that intention not only should have been, but, under the circumstances, would have

been, expressed. Stephenson v. The Frances, 21 Fed. 715; The Samuel Marshall, 4 C. C. A. 385, 54 Fed. 396; The Now Then, 5 C. C. A. 206, 55 Fed. 523; The Stroma, 3 C. C. A. 530, 53 Fed. 281; The Advance, 60 Fed. 766.

2. To sustain this libel would be to apply the law of admiralty lien in a manner for which there is no precedent. The cases cited for the appellant do not support his contention. The Alabama, 22 Fed. 449, decided nothing but that a dredge which is used in connection with a scow is itself a vessel within the maritime law; but, conceding this, it does not follow that several dredges and several scows, even when used together, constitute but a single vessel; and the cases which hold that the wrecking apparatus of a wrecking schooner (The Edwin Post, 11 Fed. 602), the whaling boats of a whaling ship (Hoskins v. Pickersgill, 3 Doug. 222), and the boats carried on deck or towed astern a fishing schooner (The Merrimac, 29 Fed. 157), may be regarded as part of the craft to which they respectively belong, are not authority for the proposition that a number of distinct vessels are to be treated as one thing, merely because they happen to be associated in the same enterprise.

The decree is affirmed.