CUDDY et al. v. CLEMENT et al.

PRINCE et al. v. OGDENSBURG TRANSIT CO.

(Circuit Court of Appeals. First Circuit. January 16, 1902.)

No. 393.

1. MARITIME LIENS—SUPPLIES—CONTRACT WITH OWNER.

The rule applied that by the maritime law no lien is presumed to arise for supplies or labor furnished a vessel on a contract made by the owner, and proof is required that the minds of the parties to the contract met on a common understanding that such a lien should be created.   The Iris, 100 Fed. 104, 40 C. C. A. 301, considered.[1]

2. SAME—IMPLIED LIEN.

The rule that an owner of a vessel, who is not also the master, may create an implied lien on her for supplies, is a modern one, confined to the United States, and not a part of the maritime law, and the distinctions and limitations of such rule have never been clearly and fully declared; but the true rule undoubtedly is, with reference to implied liens created by the owner, as well as to express liens created by him in the form of bottomry or respondentia, that there must be a maritime necessity, and this implies both a need of repairs or supplies, and a reasonable impracticability of obtaining the same on the credit of the owner.

3. SAME.

A contract between a corporation owning and operating a large fleet of steamers on the Great Lakes, and having its principal place of business in the state of New York, and a firm of coal dealers having yards at Cleveland, Ohio, and Sandwich, Canada, by which the latter agreed to furnish such coal as the company's vessels might need at such ports during the navigation season, construed, and held, in the light of the circumstances, and of similar transactions between the parties in previous years, not to give the dealers liens on the vessels for coal supplied them thereunder.

4. SAME—STATE STATUTES—LIMITATION TO DOMESTIC VESSELS.

Rev. St. Ohio, § 5880, creating liens on steamboats for supplies, labor, etc., furnished under contract with the master or owner, must be restricted in its operation to domestic vessels.[2]

Webb, District Judge, dissenting.

---

[1] Maritime liens for supplies and services, see note to The George Dumois, 15 C. C. A. 679.

[2] Maritime liens created by state laws, see note to The Electron, 21 C. C. A. 21.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

For opinion below, see 107 Fed. 978.

Harvey D. Goulder (Goulder, Holding & Masten and Carver & Blodgett, on the brief), for appellants.

Louis Hasbrouck, for appellees.

Before PUTNAM, Circuit Judge, and WEBB and ALDRICH, District Judges.

PUTNAM, Circuit Judge. The petitioners in this case, now the appellants, were coal suppliers, doing business under the name of Cuddy-Mullen Coal Company. The rule of law which governs the parties was laid down by our opinion rendered on February 2, 1900, in The Iris, 40 C. C. A. 301, 100 Fed. 104, 106, 110. The Iris was reaffirmed by us in 41 C. C. A. 679, 101 Fed. 1006, and it came before the supreme court on a petition for certiorari, which was denied, under the title of Woodworth v. Nute, 179 U. S. 682, 21 Sup. Ct. 915, 45 L. Ed. 194. The portions of the opinion in The Iris, 40 C. C. A. 301, 100 Fed. 104, to which we refer, are as follows:

"By the maritime law, no lien for supplies or labor furnished a vessel is presumed to arise on a contract made by the owner, and proof is required that the minds of the parties to the contract met on a common understanding that such a lien should be created. Neither is it sufficient that the party who furnished the labor or supplies gave credit, so far as his own intentions were concerned, to the vessel, or would not have furnished them except on the belief that he was acquiring a lien for them. In this respect the status is different from what it is with reference to liens for labor and supplies furnished a vessel on the order of her master. * *. * That understanding may, of course, be inferred from facts as well as from express language, as is ordinarily true with reference to all alleged contracts where it must be shown that the minds met."

In the case at bar, the vessels on which the petitioners claim liens were foreign to the ports where the supplies were delivered them, while in The Iris the vessel in question was domestic. Therefore many of the observations in The Iris are not applicable here.

The facts which relate to this appeal are sufficiently stated in the opinion of the learned judge who disposed of the case below, with few exceptions. The supplies, which were coal, were furnished in conformity with a contract, as follows:

"Memorandum of contract made and entered into this second day of May, 1898, by and between the Cuddy-Mullen Coal Company of Cleveland, O., and the Ogdensburg Transit Company of Ogdensburg, N. Y.:

"In consideration of the said Ogdensburg Transit Company hereby agreeing to take from the said Cuddy-Mullen Coal Company what coal the fleet of steamers operated by them may require at the points herein named, during the season of navigation of 1898, the Cuddy-Mullen Coal Company hereby agrees to furnish at its dock in Cleveland, at the following prices per ton: Youghiougheny R. M. coal, such as the steamers were supplied with last season, at the price of $1.70 per ton f. o. b. vessel and trimmed, or steam lump, same quality of coal, 10c. additional per ton, namely: To the steamers Governor Smith, F. B. Prince, W. J. Averill, J. B. Langdon, E. R. James, A. McVittis, W. L. Frost, W. A. Haskell. These prices are to continue in operation throughout the season of navigation of 1898.

"Whatever coal any of said steamers may require in Detroit river is to be furnished by the said Cuddy-Mullen Coal Company at its docks at

Amherstburg or Sandwich, at the price of $2.20 per ton aboard and trimmed for steam lump Youghiougheny.

"It is also understood and agreed that if the price of coal goes down, and other boats under similar conditions are furnished coal at Cleveland at lower prices than $1.70 per ton for run of mine, and $1.80 per ton for lump, then, and in that case, the Ogdensburg Transit Company is to have the benefit of such reduced price during the time it prevails.

"This contract is to be subject, however, and contingent upon strikes, accidents, delays of carriers, and other delays unavoidable or beyond the control of either of the parties hereto.

"Ogdensburg Transit Company.
"By F. W. Baldwin, Manager.
"Cuddy-Mullen Coal Co.,
"By L. Cuddy."

"The additional clause, written in ink, is agreed to by the signers.
"F. W. Baldwin, Manager.
"Cuddy-Mullen Coal Company,
"By L. Cuddy."

The case came into the circuit court by reason of the fact that a receivership had been constituted of the assets of the Ogdensburg Transit Company, and the Cuddy-Mullen Coal Company intervened by summary petition, claiming admiralty liens. We do not pass on any question as to the jurisdiction of the circuit court. Moran v. Sturges, 154 U. S. 256, 276, 277, 14 Sup. Ct. 1019, 38 L. Ed. 981. It appears by the record, and also by the opinion of the learned judge who sat in the circuit court, that the coal was furnished at the ports named in the contract, to the various steamers as ordered by their masters, and as required from time to time during the season, and that for the number of tons received on each occasion each master gave a receipt to the Cuddy-Mullen Coal Company.

The receipt was attached to a voucher, forwarded by the Cuddy-Mullen Coal Company to the Ogdensburg Transit Company. All the receipts and vouchers were alike in form, the Cuddy-Mullen Coal Company using therefor printed forms, furnished by the Ogdensburg Transit Company, at the request of the latter. The vouchers contained a proper form for receipts showing payment. At the close of the season,—that is to say, on December 19, 1898, —these receipts were filled out and signed by the Cuddy-Mullen Coal Company, who on that day took therefor a note of the Ogdensburg Transit Company covering all the vouchers. This note contained the following, which was cited by the circuit court, but not especially noticed by it, and which, perhaps, was not brought pointedly to its attention; that is to say, it concluded with the words, "which, when paid, shall be in full for fuel supplied to the O. T. Co. steamers, season of 1898." It is stated that this note was on a form used by the Cuddy-Mullen Coal Company in its business in cases where a lien was claimed for coal furnished. It does not appear, however, that the Ogdensburg Transit Company knew, or had any intimation of this fact, or that the clause was ever brought specifically to its attention. Moreover, the day the note was given the vouchers were receipted by the Cuddy-Mullen Coal Company "in full," without any reservation like that contained in the note. This latter fact would not change the legal effect of this part of the transaction if its legal effect were directly involved, because,

for that purpose, the receipt and note would be taken as one instrument; but it minimizes the force of this clause in the note for the only purpose for which it could be used. Of course, if liens were not given when the coal was furnished, they could not be created by any understanding which first had its origin at the time the note was given; so that the most that can be implied from this clause would be to the effect that thereby the Ogdensburg Transit Company recognized liens as already existing. It comes in, therefore, if for any purpose, as an admission, the importance and weight of which are to be tested by the other circumstances of the case.

One other fact not specifically set out in the opinion of the circuit court, and to which its attention was not directly called, was the precise terms of the contract in the particulars to which we will hereafter refer.

With regard to the coal furnished at Cleveland, the petitioners also rely on section 5880 of the Revised Statutes of Ohio, as follows:

> "Any steamboat, or other water-craft navigating the waters within or bordering upon this state, shall be liable, and such liability shall be a lien thereon, for all debts contracted, on account thereof, by the master, owner, steward, consignee, or other agent, for materials, supplies, or labor in the building, repairing, furnishing, or equipping of the same, or for insurance, or due for wharfage, and also for damages arising out of any contract for the transportation of goods or persons, or for injury done to persons or property by such craft, or for any damage or injury done by the captain, mate, or any other officer thereof, of by any person under the order or sanction of either of them, to any person who is a passenger or hand on such steamboat or other water-craft, at the time of the infliction of such damage or injury."

We do not find that this statute was particularly commented on by the learned judge who sat in the circuit court. The counsel have brought it to our attention, and, although it is not clear that it is covered by the assignment of errors, yet it involves too important propositions to be overlooked. What effect shall be given to it will be considered hereafter.

Aside from the questions which may be involved in the application of the Ohio statute, no liens arose unless a mutual understanding that there should be liens can, as said in The Iris, be properly implied from the giving and receiving of the vouchers referred to, supported by the peculiar expression in the note of the Ogdensburg Transit Company which we have cited, so far as that expression can be regarded as an admission affecting the result. Before weighing the effect of these two elements, it is necessary to clear the case of some confusion appearing at some of its stages. The position of the petitioners is not an unmixed one with reference to the distinctions between supplies ordered by a master and those ordered by an owner. It proceeds on the hypothesis that this is the ordinary case where supplies are ordered by a master in a foreign port, so that the favorable rules as to presumptions apply which were stated in The Emily Souder, 17 Wall. 666, 671, 21 L. Ed. 683, and which have often been elsewhere expressed. The propositions of the petitioners in this connection twist the case from

its natural relations to ordinary business transactions, and are properly disposed of in the opinion of the learned judge who sat in the circuit court, wherein he said:

"When the master, in any instance, notified the petitioners of the amount of coal he desired, it was presumably a notification under the contract, and the coal was presumably furnished under the contract. The situation is the same as if the manager of the defendant company had been present when the vessels arrived, and had personally notified the petitioners that he wished them to furnish under the contract the respective amounts of coal which were supplied."

Looking at all the circumstances of the case fairly, and according to the rules which we must assume govern, in their ordinary transactions, two business concerns like those involved here, and avoiding the distortion of facts for the purpose of creating a lien in behalf of the petitioners, it is too plain to require any elaboration that this extract from the opinion of the learned circuit judge states precisely the relations of the masters of the various steamers to the transactions in question; but the petitioners seek to meet this by affirming that the contract which we extract is so defective in its terms that it is a mere memorandum. They refer to the fact that it makes no provision for credit, and they claim that it only specifies what amount of coal is to be taken. Therefore they maintain that the contract amounted only to directions to the masters of the steamers with reference to the dealers or yards from whom they were to obtain their fuel. But it is formal in all respects. To be sure, it did not bind the Ogdensburg Transit Company to purchase any specific amount of coal, or, indeed, any coal at all, because it did not bind it to send the steamers named to the ports named. Its terms were clearly obligatory on the Cuddy-Mullen Coal Company to supply what coal might be required; and the fact that the Ogdensburg Transit Company was not bound to send steamers to the ports named did not change the nature of the instrument as obligatory and perfect within the terms of the law as well as from a commercial point of view. In this respect the contract was fully as specific as that under consideration by this court in Church v. Proctor (decided on February 2, 1895) 13 C. C. A. 426, 66 Fed. 240, where Judge Aldrich, speaking in behalf of the court, explained, at page 242, 66 Fed., and page 428, 13 C. C. A., that the contract was complete on its face, in the sense that it was as complete as contracts regulating undertakings of the character concerned could well be made. Maritime liens for repairs and supplies are in the nature of safeguards against the emergencies in which sea-going vessels may be placed at foreign ports, and the danger of such emergencies arising in this case was, at least, guarded against by the contract in the record before us.

Of course, it is not maintained that the mere fact that the contract failed to state whether the coal was to be paid for in strict cash affects its binding force in the eyes of the law; but this, apparently, is relied on as bearing on the proposition that, as personal credit was not stipulated for, it must be presumed that the coal was delivered in agreed reliance on a lien. Looking at the rela-

tions of these parties under similar contracts for several years, the question whether the sales were to be for cash is to be determined, not so much by any formal terms as by the prior course of dealings and the usages on the Lakes, and by a knowledge whether the Ogdensburg Transit Company was entitled to credit. So far as concerns the latter element, there are no proofs or suggestions in the record, one way or the other, except the transaction between these parties in the particular to which we will hereafter refer, and except that this corporation was the owner of a large fleet of steamers, navigating the Lakes, and was actively operating them, without any evidence, direct or indirect, that, when the contract was made, it was under any considerable indebtedness. Therefore the ordinary presumption of fact applies which applies to all persons and corporations owning and actively operating large properties, without any suggestion of not meeting obligations in the ordinary course.

But the record shows plainly that credit was intended. To the petition are attached various schedules, stating the amount of coal and the prices thereof. The claim set out in the petition is for these specific amounts, with interest from December 19, 1898, which day we can take judicial notice was about the close of the season of Lake navigation. It is the same on which the note referred to was given. The note itself was made on six months' time, and included the interest for that period, and none of the schedules attached to the petition, and no allegations of the petition, claim any interest except from December 19th. The several vouchers which have been referred to were receipted in full on December 19th, without any addition of interest. Therefore the record shows that, by the understanding between the parties, the prices were made as of a date which represented the close of the season, and that no interest was to be paid for the intervening period. This demonstrates, not only that the Ogdensburg Transit Company was entitled to credit, but that it actually did receive credit, and that it was agreed that it should have it.

Important facts are found in the very frame of the written contract between the parties. Its caption formally describes it as one between the petitioners and the Ogdensburg Transit Company. It commences with these words, "In consideration of the said Ogdensburg Transit Company hereby agreeing to take," etc.; and to the same effect are the closing words that, under certain circumstances, "the Ogdensburg Transit Company" is to have the benefit of certain reduced prices. It is true that these expressions are in no sense peculiar; but they are appropriate to ordinary contracts between two parties for merchandise, when they rely on each other and on nothing else. Nowhere does the Ogdensburg Transit Company assume to act in behalf of its steamers, or as representing them; but throughout the contract is positively expressed as one between the parties who executed it, and as individual to them and them alone. It contains at all points such features, and none others, as properly belong to a contract between two parties dealing on their own personal credit for a series of transactions.

On the other hand, the vouchers, so much relied on by the petitioners, did not assume, in any particular, to represent correctly the relations of the parties. In any event, the Ogdensburg Transit Company was liable personally for the fuel; yet it is omitted from the vouchers, which name, in each case, the vessel only. Therefore, as the vouchers were not exact in this substantial particular, there would seem to be no presumption that they intended to correctly represent the transactions. It is to be remembered that they were given at the request of the Ogdensburg Transit Company, and are exactly such, and only such, as a careful corporation, operating a line of vessels, would desire in order that it might receive the approval of the masters, and be able to keep the usual accounts with each steamer. In view of the ordinary course of transactions of careful merchants and operators, desiring proper accounts with their various properties, they are as consistent with one theory as with the other.

Some effective observations in this direction will be found in The Patapsco, 13 Wall. 329, 20 L. Ed. 696. That, also, was a case of coal furnished various steamers operated by the Commercial Steamboat Company. The coal was purchased by the agent of the corporation; but under the circumstances of the case, which, as appears in The Valencia, 165 U. S. 264, 269, 17 Sup. Ct. 323, 41 L. Ed. 710, was regarded as a very close one, it was held that the coal dealer had liens on the various steamers involved. On looking at the corresponding facts of the two cases, the reason why liens should be sustained in The Patapsco and denied here becomes apparent. As we have said, in each case the coal was ordered by the owner, but in The Patapsco there was no contract for a season, nor any other contract of a formal nature. The coal was delivered to each steamer on arrival, after requisition by the engineer on the owner's agent. The agent testified (page 331, 13 Wall., and page 697, 20 L. Ed.) that the owner was not known in the transaction. It appeared that, during the whole time the coal was being furnished, the owner was in an embarrassed condition, and that, almost simultaneously with the supplying of the first lot, all of its steamers were heavily mortgaged. At page 333, 13 Wall., and at page 697, 20 L. Ed., Mr. Justice Davis, in behalf of the court, observes:

"There is no reason to suppose that the master had funds or the owners of the line credit." "On the contrary, it is in proof that the company which owned the line of steamships was, at the date of these transactions, hopelessly insolvent, and was borrowing large sums of money on a mortgage of its steamers, away from home, and in the very city where the libelant resided."

Then the opinion follows up these facts, and says that, under the circumstances, it would be a "violent presumption" to suppose that the libelant relied on the credit of the corporation. It remarks, at page 334, 13 Wall., and at page 698, 20 L. Ed.:

"It is very clear that there was no credit to the company at the time of sale, because the coal was sold for cash, at the lowest market price."

In all the particulars which we have named, the case at bar is the reverse of The Patapsco. Under the circumstances, the court

there held, as we have already said, that the coal dealer had liens on the steamers, although it was met with the fact that the entries on his journal charged the coal to the Commercial Steamboat Company, and in no instance to the steamers. Nevertheless, it says at page 335, 13 Wall., and at page 698, 20 L. Ed.:

"There is nothing besides this journal entry to indicate that the coal was furnished on the personal credit of the company, and, as the other facts in the case are in favor of a charge direct to the steamship, we do not think the legal inference of credit to the ship is removed."

In the case at bar the effect intended to be given to the method of making the accounts is the reverse of that in The Patapsco, but the observation cited applies here. In each case the accounts and vouchers, as kept and rendered, fail to agree with the actual credit given, and also in each case they are insufficient to overcome the weight of the more important and persuasive facts. Having thus determined that, in the present case, there is not enough in the vouchers and receipts to weigh against the effect of the formal contract between the parties, it is clear that there is nothing in the peculiar expression which we have cited from the note, minimized, as it is, by the other facts to which we have referred, to influence our judgment on the question of fact involved.

The circumstances of The Havana, decided by the district court for the Eastern district of Pennsylvania (87 Fed. 487), and affirmed by the court of appeals for the Third circuit (35 C. C. A. 148, 92 Fed. 1007), are strikingly like those at bar, and the result was the same as that reached in the circuit court. Referring to the fact that the libelants relied on the manner of charging supplies on their books, the district court observed that they were made in the method common to all cases where the owners are looked to for payment, the vessel being named simply to identify the work. It appears at page 489 that the bills were made against the vessel and her owners. The court added that "they would be naturally so made, whether a lien existed or not." The court of appeals, observing, in substance, that where repairs are ordered by an owner, even in a foreign port, no lien is presumed, and that in the case before it there was nothing to show an understanding or assent by the owner that the Havana should be subject to a lien, affirmed the decree of the district court dismissing the libel. In view of the conclusions in The Patapsco and The Havana, and considering the effect which we must give to the various facts appearing in the case at bar to which we have referred, when grouped, we are of the opinion that the decree of the circuit court should be affirmed.

One other topic, however, deserves comment. The petition alleges that the coal could not have been procured except on the credit of the vessels. The answer denies this allegation, and we have already seen that there is no proof in the record in support of it. On the other hand, the frame of the contract between the parties, together with the evident understanding, as shown by the facts to which we have referred, that credit was to be given until the end of the season, lead to the conclusion that the Ogdensburg Transit Company had credit, as we have already said. The rule

that an owner of a vessel, who is not also the master, may create an implied lien on her for supplies, is a modern one, confined to the United States, and not a part of the maritime law. This is historically well known, and it is also stated by so eminent an authority as Fland. Mar. Law, § 241. Mr. Flanders understood this proposition to be supported by the opinion of Mr. Justice Johnson in The St. Jago de Cuba, 9 Wheat. 409, 416, 6 L. Ed. 122. The fact that the owner may hypothecate a vessel by an implied lien, without bottomry, must be regarded as established in the United States by The Grapeshot, 9 Wall. 129, 19 L. Ed. 651; The Guy, 9 Wall. 758, 19 L. Ed. 710; and The Kalorama, 10 Wall. 204, 214, 19 L. Ed. 941. The rule has been recognized in other cases, but it originated with those to which we have referred. It happens that, as the rule was developed, no proper distinctions or limitations have been given concerning it, except those explained by the extracts we have made from The Iris, and there shown to have been fully sustained by the supreme court.

In the case of supplies and repairs ordered by a master in a foreign port, their necesssity being shown, everything else is presumed prima facie in favor of a lien, and the burden is thrown on whomsoever disputes its validity; but, with reference to supplies ordered by the owner, it is difficult to say what the presumptions are. At one stage of the maritime law, it seems to have been understood that the owner might bottomry a vessel under circumstances which would make the bottomry valid although there were no maritime necessity therefor. Fland. Mar. Law, § 251. If such were the law, it might follow that, by a clear understanding, the owner might in like manner impress the vessel with an implied lien, although there were no maritime necessity therefor. On that hypothesis, there could be no inquiry, when repairs or supplies are ordered by the owner, whether a credit to the vessel was requisite. The true rule, however, undoubtedly is, with reference to implied liens created by the owner, as well as to express liens created by him, in the form of bottomry or respondentia, that there must be a maritime necessity. This implies both a need of repairs or supplies, and a reasonable impracticability of obtaining the same on the credit of the owner. The law is thus stated in the last edition of Abbott's Law of Merchant Shipping (London, 1892) 165. In The Kalorama, at page 214, 10 Wall., and at page 944, 19 L. Ed., this is also implied by the observation that, "undoubtedly, the presence of the owner defeats the implied authority of the master; but the presence of the owner would not destroy such credit as is necessary to furnish food to the mariners, and save the vessel and cargo from the perils of the seas." We think, therefore, that there can be no question that both the petitioner and the respondent correctly understood the law when they alleged on the one part, and denied on the other, that the coal could not have been obtained except on the credit of the vessels. This would leave only the question whether the same presumption as to the need of credit, the claimant having shown the necesssity of the repairs or supplies, arises when obtained on the order of the owner as when obtained on the order

of the master; but, as we have already stated, we are not disturbed by this, because the case shows that the Ogdensburg Transit Company had sufficient credit.

This leaves nothing remaining to be considered except the Ohio statute. In The Iris, we were careful to limit the case to the application of a state statute to a domestic vessel. Nowhere has it ever been said that a state statute is valid to alter the conditions as to maritime liens, with reference to supplies and repairs furnished vessels in foreign ports, as to which a complete set of rules has been framed by the federal courts. Whether or not an attempt of that nature would amount to a regulation of commerce, and therefore be unconstitutional, was expressly left open in The Kate, 164 U. S. 458, 471, 17 Sup. Ct. 135, 41 L. Ed. 512. A rule of construction, however, was given in The Kate which is sufficient to lead us to a conclusion with reference to the statute now in question, to the effect that we ought to restrict it to domestic vessels, as to which no other remedy exists than that given by it. It was observed that this statute originated when it was questionable whether the federal courts would exercise admiralty jurisdiction over the Lakes. If it had been finally determined that they would not, the statute might, perhaps, have had a broader range; but, as the law has been developed, we see no justification therefor. However, we can easily dispose of the case, so far as this statute is concerned, without absolutely determining its construction; because, as we said in The Iris, 40 C. C. A. 301, 100 Fed. 104, 110, even when the statute prima facie gives a lien, "the circumstances may be such, for example, when the supplies are furnished on a general account, as to show that the parties intended that credit should be given solely to the purchaser." Such is the condition of this case. With reference to this statute, our conclusions are practically the same as those of the circuit court of appeals for the Second circuit, in The Electron, 21 C. C. A. 12, 74 Fed. 689, 693, so far as that court had under consideration the application to foreign vessels of a state statute, attempting to give liens for repairs or supplies.

The decree of the circuit court is affirmed, and the costs of the appeal are awarded to the appellees.

WEBB, District Judge. I am unable to concur with the majority of the court in the disposition of this cause. In my opinion, the exceptions to the master's report should have been overruled, the report confirmed, and a decree upholding the liens entered in favor of the petitioners.