# THE NEW BRUNSWICK.

## MORRISON v. OBRION.

(Circuit Court of Appeals, First Circuit. May 4, 1904.)

No. 528.

**1. MARITIME LIENS—SUPPLIES—PRESENCE OF OWNER.**

Where the place of business of a corporation which is the owner of a vessel is at a port in a state other than that of its creation and legal domicile, and its officers are there present, to the knowledge of one who furnishes supplies in that port, the master has no authority to impress a lien on the vessel for such supplies.

**2. SAME—STATE STATUTE—FOREIGN VESSELS.**

The rule that a proceeding cannot be maintained to enforce a lien under a state statute for supplies furnished a seagoing vessel owned by a corporation of another state is not rendered inapplicable by the fact that she was enrolled at the port where the supplies were furnished, where it is not shown that the person furnishing the same was misled by such fact into believing her a domestic vessel.

Appeal from the District Court of the United States for the District of Massachusetts.

For opinion below, see 125 Fed. 567.

Eugene P. Carver and Stephen R. Jones, for appellant.

Arthur J. Selfridge (William L. OBrion, on the brief), for appellee.

Before COLT and PUTNAM, Circuit Judges, and BROWN, District Judge.

PUTNAM, Circuit Judge. This appeal arose out of an intervening petition filed by Morrison, the appellant, on the 1st day of June, 1903, in a proceeding then pending in admiralty against the steamer New Brunswick in the District Court for the District of Massachusetts. 125 Fed. 567. The petition was dismissed, and Morrison appealed to this court. The essential parts of the petition are as follows:

"That the steamer New Brunswick, during the months of June, July and August, 1902, was owned by the Colonial Steamboat Company, a corporation organized and existing under the laws of the state of Maine.

"That your petitioner during the said months was engaged in the business of furnishing and supplying coal to vessels in said Boston; that during the said months the said steamer New Brunswick was lying in the port of Boston, and in need of coal and certain labor incident to its delivery, to enable her to continue in the business in which she was engaged and for which she was intended, and, at the instance and request of her master and agent, your petitioner supplied to said steamer certain coal, labor, and supplies of which she was in need, on the dates when and in the amounts as are set out in the itemized account which is hereunto annexed, marked 'A,' and that there is due to your petitioner for said coal, labor, and supplies the sum of $1,536.32; and that the said coal, labor, and supplies were furnished on the credit of the said steamer, and the amounts charged for the same are fair and reasonable, and your petitioner is entitled to a lien on the said steamer New Brunswick for the said amount.

¶ 1. Maritime liens for supplies and services, see note to The George Dumois, 15 C. C. A. 679.

¶ 2. Maritime liens under state statutes, see note to The Electron, 21 C. C. A. 21.

"That the said coal, labor, and supplies were furnished in the port of Boston, and your petitioner duly filed in the office of the clerk of the city of Boston statements subscribed and sworn to by him, giving a true account of the demands due to him, with all just credits, and otherwise in accordance with law."

Thereupon the petitioner prayed that the District Court would decree for the balance against the steamer. The opinion of the District Court on this petition was as follows:

"This was for the price of coal. The arrangements for its purchase were made by the claimant's manager before the season began, and without any intervention by the captain. Under these circumstances, it is of little consequence who ordered the coal to be delivered from time to time. Morrison relied upon an agreement to give a lien said to have been made between himself and some of the claimant's officers, but I find that no such lien was ever agreed to by any one authorized to represent the claimant in the matter. So far as appears, even the libelant did not understand that he had a general maritime lien for the coal furnished. He seems to have supposed that he could avail himself of the lien given by the statutes of Massachusetts. He may have supposed this either because he thought the steamer was a Massachusetts vessel, or because he did not anticipate the decision of the Supreme Court in The Roanoke, 189 U. S. 185 [23 Sup. Ct. 491, 47 L. Ed. 170]. As the contract for coal was made for the season by the owners, there was no lien. Cuddy v. Clement, 113 Fed. 454 [51 C. C. A. 288]. While Morrison filed the statutory claim for a lien, he cannot, under these pleadings, avail himself of it."

There may be some question whether there was a definite arrangement for the coal before the season commenced, as stated by the learned judge of the District Court. This, however, in view of other aspects of the case, it is not necessary for us to determine. It appeared that the corporation which owned the New Brunswick, although created by the laws of Maine, had its usual, and in fact only, place of business at Boston. It also appeared that the steamer was engaged in excursion trips between Boston and Salem, making her port of rest at Boston, where the coal was supplied.

The petitioner undertakes to bring this appeal within The Surprise (decided by us on March 29, 1904) 129 Fed. 873, and The Philadelphia, 75 Fed. 684, 686, 21 C. C. A. 501, also decided by us. This he fails to do. In each of these cases, hand-to-mouth supplies were furnished at intermediate ports on the orders of the master, or under such circumstances that they were presumed to be by his orders. Certainly there is nothing in this record to enable us to frame a judgment for any portion of the coal in issue as having been thus ordered. As testified by the general manager of the Colonial Steamboat Company, it was obtained in the following manner:

"I had instructed the wharfinger [that is, the wharfinger at Boston], several times, to go to the head of the wharf and phone for coal. All coal that was sent to the dock, there was a slip sent with it. The wharfinger would receipt the slip, pass it to the engineer for his O. K., and then pass it to the treasurer."

The wharfinger was in no sense a representative of the master of the vessel; and, independently of that, inasmuch as the established place of business of the Colonial Steamboat Company was at Boston, although that city was not its legal domicile, that corporation, as the owner of the New Brunswick, must be regarded as so far present that

there was no existing emergency which vested in the master authority to impress a lien on the vessel for supplies furnished her at that port. The undisputed rule in this respect is as stated in The Lulu, 10 Wall. 192, 200, 19 L. Ed. 906, and in 2 Parsons on Shipping & Admiralty (1869) 332. The continued presence of the owner, even at a place other than that of his domicile, if known to the supplyman, as it was in this case, defeats the power of the master to impress a lien on the ship.

The only evidence which the petitioner produced on this point was that "sometimes the captain would order; sometimes Mr. Peck would order, and Mr. Ware." Mr. Ware was the treasurer of the corporation, and, as we have said, Mr. Peck was the general manager. Nothing in the record enables us to form any estimate of what coal was in fact ordered by the master, if any was so ordered, either directly or by implication, so that, if in truth any was ordered by him, it would be, as we have already said, impossible for us to frame a judgment for any specific amount in that behalf. Without going further into details, the record thus lacks definite evidence that any particular part of the coal in question was ordered by the master, either expressly or by implication.

The petitioner undertakes to bring himself within The Patapsco, 13 Wall. 329, 20 L. Ed. 696; but, alike for the reasons we have stated, and for the other reasons given by us in Cuddy v. Clement, 113 Fed. 454, 460, 51 C. C. A. 288, the circumstances of The Patapsco were essentially unlike those of the case at bar. The petitioner also insists that if what we have already said be conceded, including that the coal was ordered by the corporation itself through its principal and responsible officers, yet there was an agreement, express or implied, that the petitioner should have a lien on the steamer therefor. Aside from the question which we considered somewhat in Cuddy v. Clement, at page 462, 113 Fed., 51 C. C. A. 296, whether a lien of a maritime character could be created in that way without evidence of a maritime necessity therefor, as to which there was no sufficient proof at bar, the record fails to show a meeting of the minds, such as in several decisions we have stated is required in order to sustain this proposition. We need refer to none of our decisions on this point except Whitcomb v. Metropolitan Coal Co., 122 Fed. 941, 59 C. C. A. 465. There the opinion of Judge Aldrich, rendered in behalf of the court, stated at page 942, 122 Fed., page 466, 59 C. C. A., that, in order to raise a lien in this way, "the minds should meet in such a sense as to create an understanding or a contract that such a lien should exist for the purposes of security to the party who furnished the supplies." As, therefore, the only question is one of fact—whether the evidence sustains the petitioner in the particulars required by Whitcomb v. Metropolitan Coal Co., it would not be of advantage to detail the proofs, because it is too clear that they are so indefinite and uncertain that they do not justify us in finding this issue in his favor.

It will be noticed that the petition which we have considered represents merely that the New Brunswick was owned by the Colonial Steamboat Company—a foreign corporation, so far as the questions here involved are concerned. It does not state where she was registered or enrolled, though it perhaps left the presumption that she was regis-

tered or enrolled at some port in the state of Maine. The petition contained some allegations looking to claiming a lien under the statutes of Massachusetts. The Roanoke, 189 U. S. 185, 23 Sup. Ct. 491, 47 L. Ed. 170, as applied to the petition and the facts already referred to, rendered ineffectual any attempt to enforce such a lien. The Roanoke was decided on the 2d day of March, 1903, but the volume containing it was undoubtedly published after this petition was filed. The opinion of the District Court adverse to Morrison was passed down on July 9, 1903. Shortly previous thereto an application had been made to the court for leave to amend, alleging that at all times while the coal was being delivered the New Brunswick was enrolled at the port of Boston. We assume that the purpose of this application was to enable the petitioner to rely on the alleged statutory lien. Whether this amendment should have been allowed was, under the circumstances, a matter of discretion which we cannot revise. Any decisions of the Supreme Court apparently to the contrary, on careful examination and comparison with other decisions, will be found not to contravene this proposition as applicable to the precise case before us. But as we will see, the amendment would have been ineffectual if it had been made.

Subsequently, after the opinion of the District Court to which we have referred had been passed down, Morrison filed a new petition, alleging that the New Brunswick was during the year 1902 enrolled at the port of Boston, and evidently he aimed by this petition to secure from the District Court the enforcement in admiralty of the alleged statutory lien to which we have referred. The second petition was dismissed by the District Court on the ground of res adjudicata, holding that the disposition of the first petition on the merits barred it. As a general proposition, the court is sustained by the rule as given in Stearns on Real Actions (1831) 80, 81, and elaborated and broadly applied in United States v. California & Oregon Land Co., 192 U. S. 355, 24 Sup. Ct. 266, 48 L. Ed. ——. The usual rule undoubtedly is that where a proponent has made his case in his own way, and has gone to trial on the merits and been defeated, he cannot afterwards maintain another suit, based upon the same transaction, varying the allegations with reference to the cause of action. For other reasons, however, this petition, as well as the proposed amendment, was ineffectual.

There were no allegations in the second petition to the effect that Morrison was misled by the fact that the New Brunswick was enrolled at Boston, and there is no claim of that nature in the record. So far as either is concerned, he was wholly inconsiderate of any question as to the place of enrollment. Therefore there is no basis for any claim that a foreign vessel may be regarded as domestic, or vice versa, when the materialman has been misled. St. Jago de Cuba, 9 Wheat. 409, 418, 6 L. Ed. 122; Parsons on Shipping & Admiralty (1869) 325. Consequently the ordinary rule applies, that a vessel is domestic at the port where her owners are domiciled or reside, and foreign at other ports, wherever she may be registered or enrolled. White's Bank v. Smith, 7 Wall. 646, 19 L. Ed. 211; The Havana, 64 Fed. 496, 12 C. C. A. 361. It is also the settled law of the federal courts that a corporation is domiciled and resides in the state of its creation. Therefore Maine

was the home port of the New Brunswick, and, in any view of the case, and alike on each petition, the Roanoke meets it, and no statutory lien can be successfully maintained.

The decrees of the District Court are affirmed, and the appellee recovers the costs of appeal.