THE ALLIGATOR.  THE ALLIGRIPPUS.  THE PHŒNIX.

(District Court, D. New Jersey.  April 15, 1907.)

TOWAGE—LIEN—SERVICES—CONTRACT WITH OWNER.

The owner of a tug which rendered towage and other services in attendance on three dredges, under a contract made with the owner of such dredges in his office, on account of which bills were rendered and general payments made from time to time based on the agreed hire per day for the tug, and without reference to the particular vessel to which the service was rendered, is not entitled to a maritime lien on the dredges for a balance of hire due in the absence of any agreement or understanding therefor merely on his testimony that it was his custom, and his intention in this particular instance, to look to the vessels for payment.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Towage, § 9.

Maritime liens, see note to The George Dunmois, 15 C. C. A. 679; The Nebraska, 17 C. C. A. 102; The Electron, 21 C. C. A. 21.]

In Admiralty.

Benedict & Benedict, for libelant.

Hudspeth & Carey, for intervener and claimant.

CROSS, District Judge.  It was stipulated by the proctors of the respective parties that the testimony taken in one of the above cases should be used in each of the others.  The libels and answers are substantially the same, and the cases were argued together.  It is alleged on behalf of the libelant that the steam tug Harold rendered services at different times during certain portions of the years 1904, 1905, and 1906 in and about towing and otherwise assisting the dredges Alligator, Alligrippus, and Phœnix; that the services were of a maritime nature; that they have not been fully paid for; and that libelant has a lien against the dredges for the unpaid balance of his claim.  There was no written contract between the parties.  The evidence shows that the libelant owned the tugboat Harold which rendered the services, and that in the fall of 1904 he made a verbal contract with a Mr. Potter, the owner of the Alligator, Alligrippus, and Phœnix for the employment of his tugboat for general towing and waiting on the above-named dredges.  The tug was to do whatever the captains of the dredges required, "such as getting coal and water, waiting on them in general, pumping scows and taking scows to them, and generally bring them away and general work."  The dredges had no motor power of their own.  The price agreed upon for the service was $20 per day, which included all expenses for coal and water and use of the men on the tug.  The libelant claims that the services rendered by him under the above contract amounted in all to the sum of $5,370, of which sum there still remains due a balance of $2,820; that of said sum of $5,370 there was due from the Alligator for services rendered her $3,080, of which sum there has been paid on account $1,275, leaving $1,805 due; that from the Alligrippus there was due for like services rendered her $2,060, of which $1,275 has been paid on account, leaving $785 due, and that from the Phœnix there was due $230 for like services, no part of which has been paid.  The dates when the above payments were made are for the most part not given,

but they were made by checks and notes as follows: Check, $350; note $400; note $500; check $100; note September 9, 1905, $600; note November 17th, $600. Libelant also produced three unpaid notes made by Potter to his order as follows: December 26, 1905, $612; February 21, 1906, $609; April 24, 1906, $621. He admits that the payments were general and were arbitrarily applied by him against the amounts claimed to be due from the several dredges. The evidence on behalf of the libelant shows that the dates when the Harold was engaged in the services of the dredges was put down by its captain in a book which is said to have been subsequently stolen from the tug; that reports were made by the captain from this book monthly or semimonthly, which original reports have been destroyed. Certain statements, however, testified to have been copied from them are produced and have been offered in evidence. The captions of nearly all of them are of the following general form: "Report of tug Harold; a/c Thos. Potter, waiting on dredges Alligator, Alligrippus and Phoenix," or one or all of the dredges, as the case may be. Then follow the dates for the particular month covered by the report. A report in substantially the above form is made for each month embraced in the term of service. One report, however, is made "Tug Harold for Thos. Potter"; another "Report of Tug Harold Jan. 1905, waiting on dredge Alligator at Elizabethport"; another is like the last, except it says "Waiting on dredges Alligator and Alligrippus"; while one has no heading, but simply gives the days of the month when the alleged services were rendered, without stating for what dredge or dredges. These reports afford the only information as to how the charges were entered.

The point is made on behalf of the claimant that the charges are so made that it cannot be told therefrom with legal accuracy what portion thereof was chargeable against each dredge, and that the libels must be dismissed for that reason. In the view I take of the case, however, it is unnecessary to determine that point, since in my judgment the evidence is insufficient to support the liens against the several dredges or any of them. There was but one contract proven, and that of the nature above indicated. It was made in Jersey City at the office of the owner of the dredges, and with him personally. The only evidence tending to show that the services were rendered upon the credit of the dredges, and not of the owner, is that of the libelant himself, and, put in a narrative form, it is substantially as follows: "I knew Mr. Potter was not in very good financial standing at the time; that he owed a large amount of money to different parties. I did not think he was good pay at the latter end. I knew the dredges were all right, and I thought they were good enough for my pay. I knew that at the time. I thought they were responsible for any small amount I would charge." He then adds that he had been about the harbor and in the shipping business for a good many years, and knew what it was to collect bills against a vessel and vessel owners; knew that a vessel is responsible herself for certain kinds of debts she contracts; that he had collected money in that way at different times; and, quoting him literally, "We always looked to the vessel for our money, and did in this case." Being asked on cross-examination,

"When did you first make up your mind you were going to look to the vessel," answered, "We always do that, that is our general way of doing business"; but subsequently adds that he made up his mind when he made the bargain with Mr. Potter that he was going to hold the dredges responsible, that he made up his mind that Mr. Potter was irresponsible, but nevertheless made the bargain with him. This is the sum total of his testimony. The only circumstances, therefore, relied upon to sustain the position that the credit was extended to the vessel rather than to the owner is the alleged irresponsibility of Potter and libelant's custom.

There is not a word of testimony in the case to show that there was any agreement or mutual understanding between the parties that the dredges should be held liable for the services. The question was not mooted and the circumstances do not warrant the inference of such an understanding. The charges, if they can be dignified by that name, were really made for the most part against the owner of the dredges, and the payments were always made by him by note or check in a general way, and without application to any specific vessel or vessels. It is hardly conceivable that the owner, if he had understood that his dredges were to be held liable, would not have made specific payments on account of the different dredges, or at least would have directed the application of the payments in his own interests. The libelant's idea evidently was that dredges, no matter what the contract, or with whom made, were always responsible for services of this character, and it is apparent that he is seeking to establish a lien against these dredges, pursuant to his general custom, and not because there was any understanding or agreement express or implied that credit was to be extended to the vessels, rather than to the owner. Moreover, the evidence intended to show the financial irresponsibility of the owner is neither satisfactory nor convincing.; but, if it were, it would only be a circumstance to be considered in connection with the other testimony for the purpose of determining the understanding of the parties. Libelant said that he knew that Potter owed a large amount of money to different parties, but says nothing about his assets. He might have owed $100,000 and still have been worth $1,000,000. Again, when libelant was asked by his counsel the specific question, "Did you know whether he was good pay or not?" answered, "Well, I did not think he was at the latter end." The only inference that can properly be drawn from this answer is that he thought Potter was good pay at the beginning—that is to say, when the contract was made—and that seems to have been the fact, as nearly one-half of the claim was paid. Moreover, he had known Mr. Potter for several years and had done some work for him before. In the case of The Columbus, 67 Fed. 553, 14 C. C. A. 522, towing services rendered under a contract were sought to be recovered by libel in rem. Judge Dallas, speaking for the Circuit Court of Appeals for the Third Circuit, said:

"The material inquiry is not whether the libelant himself may have contemplated a claim of lien, but whether a lien was created by or resulted from the mutual understanding of the parties and the services rendered in pursuance of it."

And the same learned judge, speaking for the same court in The Havana, 92 Fed. 1007, 35 C. C. A. 148, says:

"Where repairs are ordered by an owner even in a foreign port, a lien for their cost is not presumed to have been contemplated, and cannot be created by any act of the party doing the work, which he may claim to be indicative of a design on his part to look to the vessel for his compensation, unless it also appear that the other party had so understood that act, and had at least impliedly assented to its purpose."

The Supreme Court of the United States said in The Valencia, 165 U. S. 264, 271, 17 Sup. Ct. 323, 41 L. Ed. 710:

"In the absence of an agreement, express or implied, for a lien, a contract for supplies made directly with the owner in person is to be taken as made on his ordinary responsibility, without a view to the vessel as the fund from which compensation is to be derived."

That case also holds that a lien will exist outside of an express agreement only when there existed "circumstances justifying the inference that the supplies were furnished with an understanding that the vessel itself would be responsible for the debt incurred." To the same effect is the decision of the Circuit Court of Appeals for the Ninth Circuit, in Alaska & P. S. S. Co. et al. v. C. W. Chamberlain & Co., 116 Fed. 600, 54 C. C. A. 56, and that of the Circuit Court of Appeals for the First Circuit in Cuddy v. Clement, 113 Fed. 454, 51 C. C. A. 288. Also Prince v. Ogdensburg Transit Co. (C. C.) 107 Fed. 978; The Now Then, 55 Fed. 523, 5 C. C. A. 206. The case under consideration does not involve any question of necessary supplies or repairs, but is one of plain contract between the libelant and owner. There is in this case no presumption of right to a lien existing in favor of libelant; on the contrary, the presumption is against such right, and such presumption must be overthrown by evidence which directly proves or reasonably warrants the inference that by mutual understanding credit was extended to the dredges, rather than to the owner. There is no reason why the law should be strained in a case like this. The libelant apparently never broached the question of a lien to the party with whom he was contracting, or said or did anything that would suggest that he was giving credit to the vessels. That idea I believe was an afterthought; but, if it existed, it existed only in his own mind, and was never in any degree given outward expression.

As I find nothing in the evidence which entitles the libelant to maritime liens against these dredges, or any of them, the libels will be dismissed, with costs.