22 U.S. 409
 6 L.Ed. 122
 9 Wheat. 409
 The ST. JAGO DE CUBA.
VINENTE, and others Claimants.
 March 15, 1824
 
 APPEAL from the Circuit Court of Maryland.
 Feb. 20th.
 This cause was argued by the Attorney-General for the appellants, and by Mr. Winder for the respondents and claimants.
 March 15th.
 Mr. Justice JOHNSON delivered the opinion of the Court.
 
 
 1
 This vessel, with her lading, found on board at the time of seizure, were libelled for an infraction of the laws prohibiting the African slave trade.
 
 
 2
 The causes of forfeiture alleged in the libels, comprise all those contained in the 1st section of the act of 1794, and those of the 2d section of the act of 1818, with the exception of the offence of being laden for the prohibited trade.
 
 
 3
 The claims filed to this libel, were,
 
 
 4
 1. That of one Vinente, a Spanish subject, who alleges her to be a regularly documented Spanish vessel, engaged in traffic sanctioned by the laws of Spain. This claim goes both to vessel and cargo.
 
 
 5
 2. Of certain seamen, who demand compensation for their wages from the proceeds of the vessel.
 
 
 6
 3. And, lastly, of several material men, who claim the payment of their bills, alleging the vessel to be foreign, and their being employed in her equipment and repairs by the captain, and one Strike, as his agent.
 
 
 7
 The Court below condemned the vessel, but restored the cargo, and from that decree the Spanish claimant has not appealed. The fate of the vessel, therefore, is irrevocably fixed; but the United States having appealed from the decree of restitution in favour of the cargo, that appeal gives rise to a complicated inquiry.
 
 
 8
 The Court below repelled every other charge against the vessel, except that of having been 'caused to sail,' with a view to be employed in the prohibited traffic. But 'being caused to sail,' is not among the offences enumerated in the latter part of the 2d section of the act of 1818, under which alone the lading of the vessel is subjected to forfeiture. That offence is among those enumerated in the enacting clause of the section, but in the forfeiting clause it is dropped; and if, therefore, the case of this vessel exhibits no other offence, than that which in the decree below was made the ground of her condemnation, the decree restoring the cargo would be well sustained; hence it becomes necessary to review the whole case.
 
 
 9
 One John Gunn, it appears, built and equipped this vessel in the port of Norfolk, as a packet, intending her for sale; but falling in debt, it became necessary to raise a sum of money upon her hull, and he accordingly took her to Baltimore for that purpose. When there, he addressed himself to one Maher, who advanced him the money, and instead of an hypothecation in ordinary form, Gunn executed a bill of sale to Maher, admitted, on all hands, to have been intended to serve only as the means of enabling Maher to expedite the vessel on a voyage to Cuba, there to be sold, and to account with Gunn for the proceeds, as well of freight as of sale.
 
 
 10
 This purpose Maher appears soon to have abandoned, for an enterprise of a very different nature. The vessel was put up for freight, and various applications ensued; but Maher undertook himself to load her for St. Jago de Cuba, and Gunn left Baltimore under the persuasion that her destination was fixed. Some time, however, having elapsed, and not hearing of her sailing, he writes to Maher on the subject, and is then informed, that he had despatched her, in ballast, to St. Jago de Cuba, under the care of Strike, a personage who, from that time, makes a conspicuous figure in the res gesta. For no sooner does she arrive at St. Jago, than she is colourably conveyed to Vinente, but still under the absolute control of Strike; and without having shipped an article, appears at once with a valuable cargo on board, the property also of Strike, furnished with a Spanish coasting license, on a voyage to Havana, thence to Matanzas, where a part of her cargo is sold, and she is completely equipped, colourably a Spaniard, but really an American, for the African trade.
 
 
 11
 On her voyage thence to the coast of Africa, she is pursued by hostile vessels, and in the chase sustains damage, which compels her to put into Baltimore to refit. There she encounters Gunn, her original and equitable owner, but who finds in her nothing of her original character, but what served to identify his vessel, and expose to him how his confidence had been abused, and his property forfeited, through his own indiscretion, in conveying her to Maher. In the present cause, his interests are out of the question, and he appears only as a witness, on behalf of the prosecution.
 
 
 12
 It is immaterial to inquire whether this vessel was in the inception of her voyage, 'laden' for the illegal purpose for which she was caused to sail. The Court below has attached much importance to the omission of this allegation; and, certainly, as a substantive offence, the vessel could not have been condemned for that cause, unless comprised among the allegations in the libel.
 
 
 13
 But as to the liability of the lading, found on board at the time of the seizure, to forfeiture under the act, that consequence is made to depend upon the liability of the vessel herself to condemnation; and, although this Court is not prepared to carry that forfeiture beyond the limits of an intimate connexion with the prohibited voyage, they are of opinion, that, in this case, that connexion is so intimate, as to leave no doubt of its liability, to the full extent of the liability of the vessel. If, then, the evidence will sustain any one of the offences alleged in the libel, which offence is made a ground of forfeiture by law, the cargo must share the fate of the vessel.
 
 
 14
 One of those allegations is, that she was fitted out; and, contrary to the opinion of the Court below, we think the evidence establishes that she was fitted out for the prohibited trade. This conclusion we place on the ground assumed in the cases of the Emily and Caroline, decided at the present Term. The general purposes of the enterprise, in its inception, are affirmed by the ground on which the Court below founded its sentence against the vessel, and are fully made out by her subsequent conduct. This point being established, it follows, that acts, which otherwise would be indifferent, and might be intended as well for an innocent as a prohibited enterprise, become offences with a view to their purpose. Besides these, the utter improbability that this voyage could have been undertaken from Baltimore to St. Jago, without many acts which would amount to a fitting out, we have the positive words of Maher himself, the dux facti in the transaction, in his letter of the 28th of October, to Gunn, in which, when speaking of having despatched the vessel to St. Jago, he says, 'Mr. Strike has an account of all her expenses in fitting out.'
 
 
 15
 This charge, therefore, we consider as established against her; and this is one of the enumerated offences which subject vessel and lading to forfeiture.
 
 
 16
 The Court below having subjected the vessel to forfeiture, and the proceeds being in the registry, was then called on to distribute those proceeds among the various claimants, the seamen and material men. Among the former, it dismissed all except that of Pietro Rosso. From the decree, as to those whose claims are dismissed, there is no appeal, and the Court is not called on to pass an opinion upon the grounds of the decision as relates to their claims. But the decree in favour of Pietro Rosso, is appealed from by the United States, and it becomes necessary to examine that part of the decree which awards him both his account, and precedence in payment of it.
 
 
 17
 We think it erroneous, and that it must be reversed, since it is impossible to believe that he entered this vessel without a perfect knowledge of her character and destination. Spanish masters, in common with all others, may commit infractions of the act of 1818, within the ports of the United States; and it is easy to conceive, that engaging a crew, as well as many other acts of preparation for this trade, may be committed by a vessel coming lawfully into the ports of this country. If the plea of stress of weather, and other incidental embarrassments, be set up, as taking a vessel out of the action of the laws against the slave trade, it is incumbent on the party who claims benefit of the excuse, to establish it. In the present instance, this seaman was engaged in the port of Baltimore, and so far was the vessel from a want of seamen, that we find the master actually refusing recruits, when offered by Strike to be put on board his vessel. If one seaman may be engaged, why may not a crew? the offence is the same in essence, though not in magnitude. The general policy of the law is, to discountenance every contribution, even of the minutest kind, to this traffic in our ports; and the act of engaging seamen, is an unequivocal preparatory measure for such an enterprise. This part of the decree, therefore, must also be reversed.
 
 
 18
 The next question arises on the claims of the material men, or rather of those whose claims were sustained in the Court below. From those which were rejected there is no appeal.
 
 
 19
 On this point, the material facts are these: that this vessel, although appearing under the character of a foreign vessel, was, in reality, in her home-port: and this, whether considered as the property of Gunn, or of Maher and Strike. The questions then arise, on what does the privilege of material men depend? On the state of facts, or on their knowledge or belief of facts? On the actual absence of a vessel from her home-port, other power given to the shipmaster, in another port, to subject his vessel to Admiralty process and implied lien, in favour of material men? And, lastly, whether the prior forfeiture of the vessel to the United States precludes their general rights, and places them on the footing of subsequent purchasers, whether with or without notice of the forfeiture?
 
 
 20
 These questions are all solved by a reference to the nature, origin, and objects of maritime contracts. The precedence of forfeiture has never been carried further than to overreach common law contracts entered into by the owner; and it would be unreasonable to extend them further. The whole object of giving Admiralty process and priority of payment to privileged creditors, is to furnish wings and legs to the forfeited hull, to get back for the benefit of all concerned; that is, to complete her voyage.
 
 
 21
 There are two considerations that fully illustrate this position. It is not in the power of any one but the shipmaster, not the owner himself, to give these implied liens on the vessel; and, in every case, the last lien given will supersede the preceding. The last bottomry bond will ride over all that precede it; and an abandonment to a salvor, will supersede every prior claim.
 
 
 22
 The vessel must get on; this is the consideration that controls every other; and not only the vessel, but even the cargo, is sub modo subjected to this necessity.
 
 
 23
 For these purposes, the law maritime attaches the power of pledging or subjecting the vessel to material men, to the office of shipmaster; and considers the owner as vesting him with those powers, by the mere act of constituting him shipmaster. The necessities of commerce require, that when remote from his owner, he should be able to subject his owner's property to that liability, without which, it is reasonable to suppose, he will not be able to pursue his owner's interests. But when the owner is present, the reason ceases, and the contract is inferred to be with the owner himself, on his ordinary responsibility, without a view to the vessel as the fund from which compensation is to be derived. From this view of the subject, this Court will be best understood, when it speaks of the home-port of the vessel, an epithet which, it is very easy to perceive, has no necessary reference to State or other limits. And from this view of the subject it results, both that the forfeiture does not ride over the rights derived under maritime contracts, whether they be called liens or privileges, and that the real owners of a vessel, who have themselves contributed to give her a foreign aspect or character, hold out the foreign captain to material men, as one legally authorized to exercise the rights and powers over his vessel which appertain to a foreign vessel. They are thus precluded by their own act from denying her foreign character. In case of wreck and salvage, it is unquestionable that forfeitures would be superseded; and we see no ground on which to preclude any other maritime claim, fairly and honestly acquired.
 
 
 24
 We concur, then, in the opinion of the Court below, that the fair claims of seamen, and subsequent material men, are not overreached by the previous forfeiture; and that, even in the homeport, a vessel may be subjected to the liabilities of a vessel in a strange port, by being falsely held up as foreign by her owners. And the question will now be considered, whether these material men have sustained their claims against this vessel upon that principle.
 
 
 25
 With this view the claims must be examined separately.
 
 
 26
 The large claim of Maher himself, the real owner, but affected agent, of the vessel, has been properly rejected, and he has not appealed.
 
 
 27
 That of Despreux, for 1856 dollars, was sustained in the Court below, and from that the United States appeal.
 
 
 28
 This item, we are of opinion, is affected by express notice. Guion swears, that upon the arrival of the vessel at Baltimore, he gave notice to Despreux of her American character, warned him against repairing her, and received for answer, that he was secured for the repairs. There is nothing in the transcript to repel this evidence, but many circumstances to corroborate it. He, therefore, does not bring himself within the rule.
 
 
 29
 There is, however, one item in this account, to the amount of 300 or 400 dollars, which was certainly good against all the world. This was for wharfage; but the credits in the account will more than cover it, and having been paid by Maher, or Strike, his employer, it is but reasonable that the payments should be applied to the item entitled to precedence.
 
 
 30
 The three claims of Hubbard & Co. for 72 dollars and 4 cents, James Ramsay for 645 dollars and 99 cents, and Richard Coleman for 256 dollars and 3 cents, have nothing in their circumstances to distinguish them from each other. They all allege the vessel to be foreign, and as she was, in fact, not foreign, the question is, whether there was an imposition practised upon them, under circumstances calculated to deceive and mislead men of ordinary vigilance.
 
 
 31
 We are of opinion there was not. It appears, that immediately on the vessel's arrival she was libelled by Gunn, and although some difficulty has existed in the cause, in consequence of Gunn's libel not having been inserted in the transcript, yet there are documents connected with it inserted, which sufficiently explain the tenor and purport of the libel, if any doubt could be entertained what that tenor was. These are, the answer and claim to it, and a retraction of that claim, from which it appears, that during the whole time these material men were furnishing this vessel, she was under arrest by the Court of Admiralty, under a libel, claiming her as American property, in her home-port, which claim, the retraction of the answer filed to the libel fully admits. There was, then, to say the least of the facts, enough to put reasonable men upon inquiry. Despreux, it appears, was put upon inquiry, and obtained security, and with ordinary prudence or vigilance these material men may have done the same. Many facts in the case concur to affect them with suspicion of positive knowledge of her real character. We think they have not sustained the exception made in the Court below in their favour, from the general doctrine, that such claims cannot be sustained against a vessel in her home-port.
 
 
 32
 The decree of the Court below, therefore, so far as the appeal of the United States brings it before this Court, will be reversed, and the proceeds of the vessel and cargo adjudged to the United States.
 
 
 33
 Decree reversed.
 
 
 34
 DECREE. This cause came on to be heard, &c. On consideration whereof, it is ADJUDGED, ORDERED, and DECREED, that so much of the decree of the Circuit Court as affirms the decree of the District Court, dismissing so much of the libel as relates to the lading of said vessel, and also so much thereof as sustains the several claims of Pietro Rosso, Joseph Despreux, Hubbard and Carr, James Ramsay, and Richard Coleman, be, and the same hereby is annulled. And it is further DECREED and ORDERED, that the proceeds of the cargo or lading of the said schooner St. Jago de Cuba, and so much of the proceeds of the sale of the said schooner as is embraced in the appeal to this Court, be, and the same are hereby condemned as forfeited to the United States, and that the proceeds of the said schooner St. Jago de Cuba, and her cargo, be distributed according to law; for which purpose, this cause is remanded to the said Circuit Court, with instructions to make such distribution.