## THE BUD III.

(District Court, S. D. Florida. May 14, 1918.)

1. MARITIME LIENS ☞5—SUPPLIES—HOME PORT.
   Under Act June 23, 1910, c. 373, § 1 (Comp. St. 1916, § 7783), giving liens to persons furnishing supplies, etc., to vessels, lien arises, though supplies were furnished to a boat in her home port.

2. MARITIME LIENS ☞37—SUPPLIES.
   Where libelant was entitled to a lien for supplies furnished vessel while in possession of one purchasing under a conditional sales contract, no act of the seller in thereafter advertising and selling boat, payment not having been made as required, can displace the lien.

3. MARITIME LIENS ☞65—SUPPLIES—EVIDENCE.
   On a libel against a vessel for supplies furnished while it was in possession of purchaser under conditional sales contract, evidence *held* to show that libelant was entitled to lien in sum of $199.35.

In Admiralty. Libel by the Gulf Refining Company against the Motor Boat Bud III. Decree for libelant for part of amount claimed.

E. M. Semple, of Miami, Fla., for libelant.
Hudson, Wolfe & Cason, of Miami, Fla., for claimant.

CALL, District Judge. The Gulf Refining Company libeled the boat Bud III, claiming $314.11 for supplies, consisting of gasoline, lubricating oils, etc., necessary for her operation. The libel alleges these supplies were furnished upon the order of the person in possession under a contract of purchase.

Claimant, among other things, alleges in his answer that the boat was sold under a conditional contract of sale, that the deferred payments were not made as provided, and that he took possession on default in the payments, and after advertisement, as provided in the contract, sold the boat at public sale, etc., and that he subsequently bought her from the purchaser at said sale.

[1] Contention is made by proctors for claimant that no lien exists by virtue of Act June 23, 1910, c. 373, 36 Stat. 604 (Comp. St. 1916, §§ 7783–7787), because such supplies as were furnished were furnished to the boat in her home port. Section 1 of the act of June 23, 1910, provides as follows:

"That any person furnishing repairs, supplies or other necessaries * * * to a vessel, whether foreign or domestic, * * * shall have a maritime lien on the vessel which may be enforced by a proceeding in rem, and it shall not be necessary to allege or prove that credit was given to the vessel."

Congress could have had but one intent in the passage of this act. It was to give a lien for supplies, etc., to the person furnishing the same, upon the vessel to which same was furnished, under the circumstances set out in the act. If such was not the intent, why specify the conditions under which the supplies, etc., were to be furnished? Theretofore the lien for supplies furnished to a vessel in her home port was dependent upon the statutes of the several states, and Congress, in the fifth section of the act, specifically supersedes all such state statutes.

This action alone, even if the words of the act were doubtful, would be very persuasive of the intent to give a maritime lien for supplies furnished a vessel, whether in her home port or not. I have examined the cases of The St. Jago de Cuba, 9 Wheat. 409, 6 L. Ed. 122, The Sinaloa (D. C.) 209 Fed. 287, and L. C. Transp. Co. v. Gulf Refining Co., 211 Fed. 336, 128 C. C. A. 15, but find nothing in them adverse to this construction of the act of Congress.

[2] If I am correct in the conclusion that the libelant has a lien for the supplies furnished the Bud III, then of course this lien cannot be displaced by any act of the claimant in advertising and selling the boat subsequent to the time such lien attached, and it remains to ascertain from the testimony what supplies, if any, were so furnished to the boat by libelant.

[3] Among the delivery slips filed in evidence by libelant are nine signed by W. A. Piner. These nine delivery slips aggregate 504 gallons of gasoline at the rate of 22 cents per gallon, except 15 gallons, for which 23 cents was charged, and oil, etc., valued at $3.33. Piner had charge of the Cecelie, and testified that the supplies signed for by him went on board the Bud III or on his boat. On his direct testimony he attempts to estimate the amount of gasoline used by him at 125 gallons. On cross-examination he says his boat was in service for 270 hours, and his engine used 2 gallons per hour; this would make 540 gallons for the entire time of service. He had 75 gallons in his tank when he commenced work, and 18 gallons when he finished. The difference of 57 gallons is therefore to be subtracted from the 540, to arrive at what actually was supplied to the Cecelie, which would be 483 gallons. Now, he receipted for 504 gallons to the libelant. It seems very probable to me that the difference of 21 gallons might easily have been used on the Cecelie in starting the engine and while the same was running idle before and after making her runs. So that, instead of using 125 gallons, I find the Cecelie used the 504 gallons for which Piner signed. This, at the prices contained in the libelant's exhibits, amounts to $111.43. Now, in these slips there are certain other supplies, lubricating oil, etc., of the value of $3.33. This amount should be added to the value of the gasoline, making a total of $114.76. For these supplies the libelant cannot recover from the Bud III. The testimony shows that the balance of the gasoline and lubricating oils, etc., were furnished to and used by the Bud III, and were furnished on the order of the purchaser in possession of the boat, and for these it has a maritime lien in the sum of $199.35 upon the Bud III.

A decree for this amount will be entered.