## THE THOMASTON.

District Court, D. Maryland. April 27, 1928.

No. 1986.

1. **Maritime liens** ⬤⟶48—**Liens of innocent claimants on fishing schooner for repairs and supplies held not extinguished by forfeiture of schooner for smuggling liquor (26 USCA §§ 1181, 1182; Merchant Marine Act 1920).**

Liens of innocent persons furnishing repairs and supplies for fishing schooner, under Merchant Marine Act 1920 (41 Stat. 988), held not extinguished by libel and forfeiture of the schooner by the government, under Rev. St. § 3450 (26 USCA §§ 1181, 1182; Comp. St. § 6352), for smuggling liquor in violation of revenue laws, and claimants were entitled to recover amount of their respective liens from proceeds of sale.

2. **Maritime liens** ⬤⟶4—**Materialman's lien against vessel flows from nature of transaction, and is not dependent on possession.**

Lien of materialman accrues by operation of general maritime law against the vessel itself, and is not dependent on possession, but follows the vessel wherever she goes.

3. **Maritime liens** ⬤⟶49—**Lien claims of innocent persons, furnishing supplies to fishing schooner forfeited for smuggling, held not lost by delay of six months or lesser period before vessel's seizure (26 USCA §§ 1181, 1182; Merchant Marine Act 1920).**

Liens of innocent persons, under Merchant Marine Act 1920 (41 Stat. 988), for supplies furnished fishing schooner forfeited and sold by government, under Rev. St. § 3450 (26 USCA §§ 1181, 1182; Comp. St. § 6352), for smuggling liquor in violation of revenue laws, held not lost by lapse of six months between time of

furnishing supplies and seizure of vessel, or lapse of shorter periods as in case of other claimants.

**4. Maritime liens ⊂⇒49—Eighteen months' delay in prosecuting claim of lien against proceeds of sale of forfeited fishing vessel held not fatal (26 USCA §§ 1181, 1182; Merchant Marine Act 1920).**

Eighteen months' delay of one claiming lien, under Merchant Marine Act 1920 (41 Stat. 988), for supplies and repairs against fishing schooner, libeled and forfeited by government under Rev. St. § 3450 (26 USCA §§ 1181, 1182; Comp. St. § 6352), for smuggling liquor, *held* not to prevent claimants' recovery of proceeds of sale, since long periods of credit are frequently allowed fishing boats on account of their inability to pay before making and selling their catch.

**5. Maritime liens ⊂⇒67—Innocent persons, claiming lien against fishing schooner from proceeds of government's sale after forfeiture, held entitled to interest on claims (26 USCA §§ 1181, 1182; Merchant Marine Act 1920).**

Innocent persons, claiming lien for supplies and repairs, under Merchant Marine Act 1920 (41 Stat. 988), from proceeds of sale of fishing schooner, libeled and forfeited by government under Rev. St. § 3450 (26 USCA §§ 1181, 1182; Comp. St. § 6352), *held* entitled to interest at regular rate from date of filing claims until entry of decree.

In Admiralty. Libel by the United States for the forfeiture of the schooner Thomaston, in which claims were presented by various lien claimants with respect to the proceeds of the sale. Certain claims were allowed by the special commissioner, and the United States excepts. Claims allowed, with interest.

Amos W. W. Woodcock, U. S. Atty., of Baltimore, Md.

John H. Skeen, of Baltimore, Md., for claimants.

WILLIAM C. COLEMAN, District Judge. The question presented for determination is the priority between the United States government and innocent maritime lien claimants with respect to the proceeds of sale of the schooner Thomaston, which was libeled and forfeited by the government under Revised Statutes, § 3450 (26 USCA §§ 1181, 1182; Comp. St. § 6352), the vessel having been engaged in smuggling liquor into the country in violation of the revenue laws; that is, whether the forfeiture of a vessel under this section is absolute and in derogation of all liens, or whether the claims of innocent maritime lienors survive such forfeiture.

The validity of the forfeiture and sale of the vessel has not been questioned. Further, it is admitted that all of the claims are properly within the class of claims for repairs and supplies contemplated by general maritime law and by the provisions of the Merchant Marine Act of June 5, 1920 (41 Stat. 988). That part of section 3450, under which the vessel was forfeited and sold, provides as follows:

"Whenever any goods or commodities for or in respect whereof any tax is or shall be imposed, or any materials, utensils, or vessels proper or intended to be made use of for or in the making of such goods or commodities are removed, or are deposited or concealed in any place, with intent to defraud the United States of such tax or any part thereof, all such goods and commodities, and all such materials, utensils, and vessels, respectively, shall be forfeited; and in every such case all the casks, vessels, cases, or other packages whatsoever, containing, or which shall have contained, such goods or commodities, respectively, and every vessel, boat, cart, carriage, or other conveyance whatsoever, and all horses or other animals, and all things used in the removal or for the deposit or concealment thereof, respectively, shall be forfeited. * * *"

The matter was referred to a special commissioner to determine, first, the nature and amount of the claims of the various intervening petitioners, and also their right, if any, to share in the proceeds of the sale of the vessel, and the nature and priority of the respective claims as against each other and as against the claim of the United States. The special commissioner found that the rights of the petitioners had not been affected by guilty knowledge or inexcusable laches; that thus being innocent maritime lien claimants, asserting their liens in due season, the forfeiture of the vessel did not destroy or depose such liens; and that the claims of all of the petitioners should be satisfied, without interest, out of the proceeds of the sale of the vessel.

The government has excepted to the report of the special commissioner and contends that lienors, whether innocent or not, cannot recover when a vessel has been thus forfeited under Revised Statutes, § 3450. The government does not appear now to be making any serious contention of either guilty knowledge or laches on the part of the lienors, but seeks a review of the findings of the special commissioner that the forfeiture of the vessel does not destroy the maritime liens of prior innocent claimants.

[1] The court is of the opinion that the finding of the special commissioner is correct. Because of the importance of the principle underlying this case; of the fact that this is

the first time, apparently, that a court has been called upon to decide this precise question, and also because of the thorough study which the special commissioner has given to it, as evidenced by his report, and the clear, succinct manner in which he has therein set forth his conclusions and his reasons therefor, the court adopts his report, in toto, with an exception respecting the allowance of interest, and incorporates it herein:

"On April 3, 1925, the marshal sold the schooner Thomaston at public sale and realized thereby the net sum of $2,799.60, to be deposited to the credit of the Treasurer of the United States. His return was filed May 1, 1925. The sale so reported was in pursuance of the court's decree of condemnation and sale, entered March 21, 1925, upon the government's libel of information, filed February 16, 1925, claiming forfeiture of the vessel under section 3450 of the Revised Statutes of the United States.

"On April 3, 1925, the Atlantic City, N. J., Fisheries Company, Inc., Moncrief's Machine Shop, Joseph A. Wilson and Hurley Booye, copartners trading as Cape May Fisheries, Inc., and John C. Smith and C. W. Edwards, copartners trading as Smith-Edwards Machine Shop, filed their joint intervening petition claiming maritime liens against the Thomaston, for supplies and repairs furnished to her prior to her seizure, and praying payment out of the proceeds of her sale. As special commissioner, I am instructed to determine and report upon the following questions:

"(a) The nature and amount of the claims of the intervening petitioners.

"(b) The question of whether or not they have claims against the fund, and the nature and priority of said claims as against each other and as against the claim of the United States.

"I have heard all of the testimony which any of the parties desired to produce, and I have attentively considered the briefs and oral arguments of counsel. My conclusions are as follows:

"The petitioners do not contest the propriety of the forfeiture and sale. They contend, however, that their rights as innocent maritime lien claimants are superior to the rights of the United States arising out of the forfeiture, and therefore that their claims are payable out of the fund realized from the sale of the vessel.

"The government maintains, primarily, that the forfeiture of a vessel under section 3450 is 'absolute' and in derogation of all liens; secondly, that, even if these liens have

26 F.(2d)—18½

not been so abrogated, the petitioners cannot recover because they knew of the 'illegal activities' of the vessel; and, thirdly, because petitioners have been guilty of laches in the prosecution of their several claims.

"I am satisfied from the testimony that all of the claims are legitimately within the category of 'repairs and supplies' contemplated by the general maritime law and the provisions of the Merchant Marine Act of June 5, 1920. The district attorney is principally concerned with the question of the effect of the forfeiture. He stresses its absolute character, and desires to test the question. He has favored me with a full brief, as have counsel for the intervening petitioners. I have endeavored to respond by careful consideration of the authorities and arguments upon the question whether or not the Thomaston was forfeited subject to the maritime liens of the intervening petitioners.

"Supporting the affirmative of this question, the petitioners submit a line of authorities beginning with The St. Jago de Cuba, 9 Wheat. 409, 6 L. Ed. 122, and ending with The Eugenia Emilia (D. C.) 298 F. 340. It is unnecessary to refer to the intervening citations, because the principles enunciated by the Supreme Court in the case of The St. Jago de Cuba are those relied upon from first to last. It will be profitable to review that decision here.

"The vessel was built as an honest packet, but she fell into evil ways and eventuated as a slave runner, and she was libeled by the government and condemned and sold, with her cargo, as such. The claims of seamen and materialmen were interposed, giving rise, as between them and the government, to a question similar to that raised in this case; the difference being that the Thomaston has been forfeited and sold for smuggling. In the course of its opinion, the Supreme Court said:

"'The precedence of forfeiture has never been carried further than to overreach common-law contracts, entered into by the owner, and it would be unreasonable to extend them further. The whole object of giving admiralty process and priority of payment to privileged creditors is to furnish wings and legs to the forfeited hull, to get back, for the benefit of all concerned; that is, to complete her voyage. * * * The vessel must get on; this is the consideration that controls every other; and not only the vessel, but even the cargo, is sub modo subjected to this necessity.'

"Maintaining the negative of the question of whether or not the lien survives, the dis-

trict attorney cites the following cases: The Cherokee (D. C.) 292 F. 212; The Ella (D. C.) 9 F.(2d) 411; U. S. v. One Ford Coupé, 272 U. S. 321, 47 S. Ct. 154, 71 L. Ed. 279, 47 A. L. R. 1044 (decided Nov. 22, 1926); U. S. v. One Saxon Automobile (C. C. A.) 257 F. 251; Goldsmith, Jr.,-Grant Co. v. U. S., 254 U. S. 505, 41 S. Ct. 189, 65 L. Ed. 376; also the following cases: Dobbins v. U. S., 96 U. S. 395, 24 L. Ed. 637; U. S. v. Stowell, 133 U. S. 1, 10 S. Ct. 244, 33 L. Ed. 555; U. S. v. One Black Horse (D. C.) 129 F. 167.

"The latter group are submitted as authorities for the proposition that, under forfeiture statutes, the guilt or innocence of the *owner* of forfeited property is immaterial. It is to be observed that none of the cases referred to by the government involves the claimant of a strictly maritime lien, and, so far as I have been informed, the courts have not yet been called upon to decide whether or not such a lien survives forfeiture under section 3450. I am of the opinion that it does.

[2] "The lien of the 'materialman,' as ancient as commerce itself, accrues by operation of the general maritime law against the vessel itself, as distinguished from the owner. Unlike the common-law lien of the mechanic, it is not related to possession, nor to contract with the owner, but flows from the nature of the transaction which provides a service essential to the vessel, giving rise to a lien which follows her into whosesoever hands she may go. Benedict, Admiralty (3d Ed.) § 271, and cases there cited.

"The lien which thus existed centuries prior to the enactment of section ·3450, and which has been uncompromisingly confirmed and rendered more readily available by recent acts of Congress, has not been fundamentally changed. It is the same lien, which, upon rendition of the service, spontaneously attaches to the body of the vessel. The Snetind (D. C.) 276 F. 139; The St. Jago de Cuba, 9 Wheat. 409, 6 L. Ed. 122.

"It has been adjudged to survive forfeiture for slaving and piracy, crimes so serious as to excite the forces of suppression to the utmost; and I cannot perceive the logic of holding, in the absence of direct authority, that it must yield to forfeiture for smuggling. Nor am I unmindful of the far-reaching language of Mr. Justice McKenna in delivering the opinion of the Supreme Court in the case of Goldsmith, Jr.,-Grant Co. v. U. S., 254 U. S. 505, 41 S. Ct. 189, 65 L. Ed. 376:

" 'It is the illegal use that is the material consideration, it is that which works the forfeiture, the guilt or innocence of its owner being accidental. If we should regard simply the adaptability of a particular form of property to an illegal purpose, we should have to ascribe facility to an automobile as an aid to the violation of the law. It is a "thing" that can be used in the removal of "goods and commodities," and the law is explicit in its condemnation of such things.'

"The reasoning of that opinion, wherein an automobile was held properly forfeited under section 3450, against the protest of the owner who had retained title for the unpaid purchase price, represents, in my judgment, the high point of the government's argument in this case. But I cannot think that investiture of the automobile with personality, and its condemnation as the guilty res, suffices to overcome the same conception of a vessel to which a lien for repairs and supplies has attached. It is true that section 3450 makes no exceptions, but, in this aspect, neither does the general maritime law nor the Merchant Marine Act. And the fact remains that, in the case referred to, the Supreme Court was dealing with an automobile, and *not* with a vessel. For like reasons, I distinguished the cases of U. S. v. One Saxon Automobile (C. C. A.) 257 F. 251, and U. S. v. One Ford Coupé, 272 U. S. 321, 47 S. Ct. 154, 71 L. Ed. 279.

"In The Cherokee (D: C.) 292 F. 212, the claimant was the holder of a chattel mortgage, and not of a maritime lien for supplies; so that the question at bar was not there presented. Likewise in the case of The Ella (D. C.) 9 F.(2d) 411, there was no maritime lien on the boat involved. I think the better view is that the forfeiture of the Thomaston did not depose the liens, and I consider the petitioners entitled to satisfaction out of the proceeds of her sale, unless their rights have been forfeited by guilty knowledge or inexcusable laches.

"The witnesses for petitioners were cross-examined by the government as to knowledge of previous unlawful activities of the vessel, and the previous conviction of her former master, one Albert Aspinberg. In the same connection, the government offered the docket entries of a criminal proceeding in Pennsylvania against Aspinberg and others, showing his conviction in 1921 for conspiracy to import intoxicating liquors. The government also offered the docket entries of a libel against the Thomaston and her condemnation and sale in 1921. The latter entries do not indicate the nature of the proceeding, and the district attorney informs me that he does not desire further to develop this as-

pect of the case. I admitted all of the evidence, because my suspicions were aroused; but I cannot find that any of the witnesses knew anything about the criminal activities of Aspinberg, until after the event, nor is Aspinberg in any way identified with the present seizure.

"Moreover, if strict lines are to be drawn, and I think that in a case of this character they must be, evidence which would be serviceable in connection with a prosecution under the National Prohibition Act (27 USCA) would not necessarily be relevant in the case of a forfeiture under section 3450. The district attorney rightly insists upon strict forfeiture under the latter, as distinguished from the former; but maritime lien claims are also matters of strict right, and, although I have closely examined the testimony, I cannot conclude from it that any of these claimants knew of, or furnished the vessel in contemplation of, the illegal exploit which resulted in her seizure at Baltimore. All of them dealt with her as a boat regularly engaged in fishing and there is nothing in the record which contradicts their assertions of innocence.

[3] "There remains the question as to whether or not any of the claims have been lost through laches. The bill presented by the Cape May Fisheries Company represents supplies furnished on December 11, 1924. The seizure of the Thomaston was on December 18, 1924. The supplies were furnished upon the order of Aspinberg, and this fact, together with the proximity to the seizure, were circumstances which, at first, excited my suspicions. But I find, upon examining the libel, the allegation that at the time of the seizure the master of the vessel was one William Morley. Aspinberg is not mentioned. While the proximity of dates tends to arouse distrust, it also effectively disposes of any question of laches as to the prosecution of the claim.

"The supplies furnished by the Atlantic City, N. J., Fisheries Company were delivered to the vessel in the summer of 1924, some six months before the seizure. This period of delay was not too long under the circumstances.

"The work done by Smith-Edwards Machine Shop was in October and November, 1924, only a month prior to the seizure, so that the claim is in good standing in respect of diligence.

[4] "I must reject that portion of the Moncrief claim which accrued prior to the sale in Philadelphia above referred to. Mr. Moncrief should have prosecuted his then claim

against the proceeds of that sale, and, having failed to do so, he must lose it. Even as to the balance he delayed prosecution some 18 months. His explanation is twofold: That in the interval he sold his business at Atlantic City and removed to Philadelphia, causing some confusion in his affairs, and that long periods of credit are frequently extended to fishing boats, because it is recognized that they must make and sell their catch before being expected to pay. I am inclined to accept these explanations. It is well known that the creditors of fishing boats must wait for their money, and doubtless the prices which they pay are regulated with this in view. It seems to me, however, such being the case, that the creditors have slight claim to interest; and I am inclined to disallow it.

"My recommendations are that the claims of all of the intervening petitioners should be allowed, without interest, and that payment should be decreed out of the proceeds of the sale of the Thomaston, as follows:

| | |
|---|---|
| Atlantic City, N. J., Fisheries, Inc. | $193.10 |
| Moncrief Machine Shop | 114.21 |
| Cape May Fisheries Company | 260.07 |
| Smith-Edwards Machine Shop | 469.56 |

"I consider, also, that the costs under the intervening petitions should be paid out of the fund."

There seems to the court to be no sound reason for arriving at a different conclusion in this case from that reached in the line of cases commencing, as the commissioner points out, with the decision of Justice Johnson in 1824, in St. Jago de Cuba, 9 Wheat. 409, 6 L. Ed. 122, and coming down to the decision of Judge Lowell in The Eugenia Emilia (D. C.) 298 F. 340, a hundred years later, albeit in none of these cases does section 3450 appear to have been before the court with respect to maritimes liens. Such liens have been given preference wherever asserted by claimants ignorant of the unlawful operation of the vessel forfeited, and in the statutes under consideration in the earlier decisions there was, just as in section 3450, no express exception made in favor of such liens.

"In U. S. v. One Saxon Automobile, 257 F. 251, cited by the government, Judge Woods, speaking for the Circuit Court of Appeals for this circuit, in decreeing forfeiture as against a mortgagee of an automobile for use in transporting liquor, said, at page 252:

"Nevertheless, if the inference of intention to exempt from forfeiture the property of an innocent owner can be drawn by any reasonable and fair construction of the lan-

guage of the statute, that construction will be adopted. This rule of construction has been extended without dissent to protect the innocent owner of property from forfeiture, even when provided by a statute which expresses no limitation or exemption of any kind, where the property has been taken by a trespasser or a thief, or the owner has been deprived of the possession by forces of nature beyond his control. This is for the reason that no right of possession or custody can be acquired by or from a trespasser or thief, or by virtue of the forces of nature against the will of the owner. In such case, the owner of the property has never in a legal sense parted with any right of custody or possession, and hence no statute can operate against his title by reason of the use or custody or possession of the thief or trespasser, or his deprivation of it by the forces of nature. *This reasoning obviously does not apply when the owner voluntarily parts with his possession and intrusts his ship or vehicle to another, for in that case the owner is charged with knowledge that the person to whom he has relinquished possession, or some one acquiring the possession from him, may so use the property as to defeat the collection of the revenue, and thus bring it under the condemnation of forfeiture.* While the principle is not elaborated, this we think was the distinction in the mind of Chief Justice Marshall in Peisch v. Ware, 4 Cranch, 347, 2 L. Ed. 643. The principle was applied in holding that all previous liens on vessels are overridden by forfeiture in prize cases; the court saying, if it were otherwise, shipowners could in all cases defeat forfeiture by giving mortgages on their ships. The Hampton, 5 Wall. 372, 18 L. Ed. 659; The Battle, 6 Wall. 498, 18 L. Ed. 933; The Siren, 7 Wall. 152, 19 L. Ed. 129." (Italics inserted.)

It will be seen that Judge Woods rests the forfeiture in the above case on the ground that the mortgagee had, by giving possession to the mortgagor, put it within his power to bring the motor vehicle under forfeiture statutes, and therefore he should suffer the consequences of his voluntary act. While this reasoning is eminently sound in its application to the facts then before the court, we cannot lose sight of the distinction between maritime and other liens, and therefore, although Judge Woods does mention a ship in the same category with a vehicle, it is proper to treat this as dictum, if not, indeed, made with reference to a nonmaritime lien upon a ship—not a maritime lien, such as ex-

ist in the present case. See, also, the following cases involving seizures under section 3450 of the Revised Statutes decided since the report was made by the commissioner in the present case. Commercial Credit Co. v. U. S., 48 S. Ct. 232, 72 L. Ed. ——; U. S. v. Commercial Credit Co. (C. C. A.) 20 F.(2d) 519; General Motors Acceptance Corp. v. U. S., 23 F.(2d) 799 (C. C. A. 4th Circuit). None of these cases, however, involved maritime liens. A maritime lienor cannot be said to have voluntarily given possession of the vessel to another, thereby enabling him to commit a wrong. In fact, the maritime lienor has no choice but to allow the ship to proceed. If he could hold it until paid, there would be no reason to give him a lien. The very purpose of the lien is to protect him, since he must let the vessel proceed on its journey, having given it "wings and legs" for the voyage.

[5] With respect to the matter of interest, the court feels that it may properly be allowed. These claimants are not proceeding against the government, but against a fund in its hands, and, furthermore, granting the truth of the assumption upon which the commissioner appears to have proceeded, namely, that these claimants anticipated that, in the very nature of the trade, settlement of their accounts would be tardy, and they charged accordingly, still such would not necessarily provide against the more extended delay incident to forfeiture.

Accordingly, the court awards interest at 6 per cent. from the date of the filing of each claim, to the date of entry of decree.