**BARD v. THE SILVER WAVE.**

No. 3348.

United States District Court
D. Maryland, Admiralty Division.

May 23, 1951.

A. Adgate Duer, Niles, Barton, Yost & Dankmeyer, Baltimore, Md., for libellant.

Hall Hammond, Atty. Gen. of Maryland, Ward B. Coe, Jr., Asst. Atty. Gen., for respondent.

CHESNUT, District Judge.

This case is a libel in admiralty by certain holders of alleged maritime liens to sell the motor boat Silver Wave which is now in the possession of the Tidewater Fisheries, an agency of the State of Maryland, pursuant to a seizure and confiscation of the boat for violation of a Maryland statute regarding conservation of oyster beds. The principal question in the case is whether the maritime liens respectively, if otherwise valid, survive this forfeiture of the boat. The question arises from the following facts which I find from the evidence.

The Silver Wave is a motor boat of about six tons net having a length of

39.5 feet, breadth of 11.3 feet and registered depth of 3 feet. It is propelled by gasoline power. For some time prior to February 9, 1950 the boat was owned by Robert Wilson, and registered and licensed in the office of the Collector of Customs of Reedville, Virginia. On February 9, 1950 the boat was sold by Wilson at Crisfield, Maryland, to Rue Tawes McCready for $1,600. The vendor gave a bill of sale to the purchaser. The whole of the purchase money was borrowed by the purchaser from his brother, Oliver H. McCready, who on the same day was given a mortgage on the boat by the purchaser. The two McCready brothers live on Smith Island in the Chesapeake Bay, Maryland, about 12 miles from Crisfield, on the Eastern Shore of Maryland, and on April 11, 1950 the boat was registered by the new owner in the office of the Collector of Customs at Crisfield and its license renewed for one year. At the same time the mortgage on the boat was also recorded in the office of the Collector of Customs at Crisfield.

The mortgagee, Oliver H. McCready, is a marine blacksmith. On various dates between March 14 and August 15, 1950, he made for or supplied to his brother, the boat owner, certain articles and equipment for the boat, some of which were obviously to be used for the taking of oysters. They did not include the alleged unlawful dredge. The bill for this equipment and supplies amounted to $528, none of which has been paid; nor has any payment been made on account of the principal of the mortgage for $1,600.

The original libellant in the case is M. C. Bard. His occupation is a marine machinist at Crisfield. On July 29, 1950 the boat owner took the boat to Bard for repairs to the clutch of the engine. The work was completed August 31, 1950 and Bard's bill therefor was $230.50. Upon request Bard allowed the boat owner to take the boat without first paying the bill, none of which has been paid. He says that at the time the boat owner assured him that the bill would be paid by his brother Oliver whom Bard knew by reputation to be a reliable man. The amounts of the bills of Oliver McCready for equipment and supplies to the boat, and of Bard for work done on the boat, were fair and reasonable.

In September 1950 the boat was used by its owner in the taking of oysters. On September 25, 1950 a warrant was issued by a Justice of the Peace for Talbot County, Maryland, for the arrest of Rue Tawes McCready, the boat owner, for unlawfully permitting a dredge on board the Silver Wave in the taking of oysters in violation of section 5A(a) of Article 72 of the Maryland Code of Public General Laws (Flack's 1947 Supp.). On October 12, 1950 Rue Tawes McCready appeared, was represented by counsel, informed of his right to a jury trial which he waived, and elected to be tried by the trial magistrate. He pleaded guilty, was given a suspended sentence and the judgment read: "it is further ordered this 12th day of October, 1950, that the boat ('Silver Wave' No. 257025,) hailing from Ewell, Maryland, and all its cargo, tackle, gear and equipment be and the same is hereby forfeited to the State of Maryland, the same to be delivered to the Department of Tidewater Fisheries for such disposition as may, in the opinion of said Department be most advantageous to the State of Maryland."

The libel in the case was filed by Bard on February 5, 1951. Oliver H. McCready has filed the intervening libels above mentioned. The Department of Tidewater Fisheries of the State of Maryland has filed answers to the original and intervening libels. It contends that the judicial confiscation of the boat has destroyed all prior maritime liens thereon. This is the only defense now interposed by it to the otherwise clearly well established maritime lien in favor of Bard; but with respect to the intervening libels of Oliver McCready, the Tidewater Fisheries also contends that the mortgage is defective and that neither it nor the claim for equipment and supplies in the amount of $528 is enforceable because the respondent alleges that Oliver McCready had knowledge or notice of the illegal activities of his brother, the boat owner, in the use of the boat.

■ With respect to this latter contention, as to the alleged knowledge of Oliver McCready, 1 feel obliged to find from the evidence against the contention of the Tidewater Fisheries. As a witness Oliver McCready positively denied having such knowledge or even constructive notice, and there is no affirmative proof to the contrary. The respondent's contention is based on some not very weighty circumstances which possibly reasonably give suspicion but do not amount to proof. Both brothers live on Smith Island in their respective houses about a quarter of a mile distant from each other. At times the Silver Wave was tied up at a wharf or dock not more than 150 feet from Oliver McCready's blacksmith shop. An employee of the Tidewater Fisheries on several occasions saw Oliver McCready on the Silver Wave at said location; but there was no illegal equipment on the boat at those times. Oliver McCready is unmarried and lives with another brother while the boat owner, Rue Tawes McCready, is married and has a number of children. The transaction between the brothers as to loaning the money and taking the mortgage as security and the failure to insist upon payment on account of the mortgage or for the supplies and equipment indicate lack of business care but are not of themselves inconsistent with fraternal relations. In short, on this issue of fact my finding is that while the circumstances may arouse suspicion they are not sufficient to constitute proof of knowledge by Oliver McCready of unlawful use of the boat by his brother.

The chief contention of counsel for the State of Maryland is that the forfeiture of the boat under State law destroyed all the prior liens. Section 5A(a) of art. 72 of the Maryland Code makes it unlawful for the owner, captain or master or any member of the crew of a power boat "to have on board such boat, or in tow, or to permit on board or in tow, any scoop, scrape, dredge or similar instrument used in dredging * * * unless said boat be licensed to dredge on leased land, or unless said boat be engaged in taking seed oysters under the surveillance and with the permission of the Department of Tidewater Fisheries." Section 16(c–1) of said article 72 further provides that for violations of section 5A the guilty persons may be fined or imprisoned or both, and in addition thereto the court having jurisdiction may enter an order forfeiting the boat, the same to be delivered to the State of Maryland for the use of the Tidewater Fisheries.

■ The effect of the forfeiture under this statute must be considered separately with respect, on the one hand, to the maritime liens for work and supplies, and on the other, to the claim of the mortgagee. With respect to the liens other than the mortgage, I hold that the forfeiture did not destroy them. It has frequently been decided, and it is not disputed by counsel for the State, that forfeitures of ships under statutes *of the United States* do not destroy otherwise valid prior maritime liens where their holders are innocent of any complicity in violations of federal statutes by the ship. The St. Jago de Cuba, 9 Wheat. 409, 6 L.Ed. 122; The Thomaston, D.C.Md., 26 F.2d 279; The Eugenia Emilia, D.C.Mass., 298 F. 340; The Ermis, D.C.Fla., 33 F.2d 763; The Olympia, D.C.Conn., 58 F.2d 638; Robinson on Admiralty, pp. 453–455. While counsel for the State concedes that this is true with respect to forfeitures under federal statutes, he contends that a different rule must prevail where the forfeiture is under a State statute. He is able to cite no authority for this contention and I know of none. On principle we are dealing with a case which indisputably is within the exclusive jurisdiction of the admiralty court and where the admiralty law of the United States must be given controlling effect. The reasoning of the federal decisions above cited stresses the importance of sustaining otherwise valid maritime liens in order to keep the ship a going concern. It is not necessary here to reiterate this reasoning which has so long and consistently been applied by maritime law. In principle there is no reason for distinguishing between federal and State forfeiture of ships with respect to prior maritime liens. Counsel for the State re-

fers to Smith v. State of Maryland, 18 How. 71, 15 L.Ed. 269, where the Supreme Court upheld a forfeiture under Maryland law of a vessel found unlawfully dredging oysters in local waters, and reference is also made to C.J. Hendry Co. v. Moore, 318 U.S. 133, 63 S.Ct. 499, 87 L.Ed. 663, upholding a California State confiscation of a fishing net. But neither of these cases involved maritime liens.

A closer question is presented when we consider the effect of the forfeiture on the mortgage. Counsel for the mortgagee contends (1) that section 961(b) of title 46 U.S.C.A. saves the mortgage from the effects of forfeiture and (2) that the mortgage in this case should be considered to be a "preferred" mortgage and as such, under the provisions of sections 922 and 953 of title 46 U.S.C.A., be preferred to the lien claims for work and supplies.

■ It is very clear that the mortgage in the instant case cannot be treated as a preferred mortgage. As early as 1850 federal statutes provided for the recordation with the Collector of Customs of ordinary mortgages and the failure to record them properly invalidated them, except as between the parties, with respect to valid claims of other persons having no notice. The status of a preferred mortgage seems to have been first provided for in the Merchant Marine Act of 1920, 41 Stat. 1000, et seq. Now that statute is found in 46 U.S.C.A. § 911, et seq., entitled "Ship Mortgage Act" and particularly sections 922, 951, 952, 953, 961. Section 922 prescribes what additional requirements, other than those of an ordinary mortgage, are necessary to constitute a ship mortgage a preferred mortgage. Among others the mortgage must be endorsed upon the vessel's documents (in this case its license) and an affidavit must be filed with the record of the mortgage in the office of the Collector of Customs "to the effect that the mortgage is made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel." If the additional requirements are also complied with the mortgage is then called a "preferred" mortgage.

The mortgage here has been filed as an exhibit. It was prepared on a printed form furnished by the Collector of Customs. It does not purport on its face to be a preferred mortgage and the evidence does not show that there was any intention on the part of the parties to it that it should be treated as a preferred mortgage. The transaction was handled for the parties by a Crisfield lawyer who has not appeared as a witness or counsel in this case. The mortgage was not endorsed upon the ship's documents carried on the ship although it is said that the mortgage was itself separately carried on the ship. The mortgage did not have the required affidavit and was not designated as a preferred mortgage in the mortgage itself. In the case of The Emma Giles, D.C., 15 F.Supp. 502, in this court some years ago I expressed the view that the statutory provisions as to preferred mortgages should be strictly complied with. Counsel for the mortgagee cites The Nanking, D.C.Cal., 1923, 292 F. 642, to the effect that the requirement of endorsement on the ship's papers is directory. But see Morse Dry Dock & Repair Co. v. The Northern Star, 1933, 271 U.S. 552, 46 S.Ct. 589, 70 L.Ed. 1082. But in any event it seems perfectly clear to me that, having in mind the general purpose of the requirements as to the missing affidavit and endorsement with respect to giving notice to other parties, there could be no possibility of treating this mortgage as a preferred mortgage even if it could be found that there was an attempt to substantially comply with the requirements, which latter element, as I have said, is not itself present in this case. It results that this mortgage cannot be given any priority over the maritime lien claim of Bard. See also The Angler, D.C.N.Y., 23 F.Supp. 341.

■ A more difficult question arises with respect to the effect of the Maryland State forfeiture on the mortgage, treating the latter as merely an ordinary and not a preferred mortgage. Counsel for the mortgagee relies upon the case of The Mariam, 9 Cir., 1933, 66 F.2d 899, 900. In that case the district judge had held that the mortgage, not shown to be a preferred

mortgage, was destroyed by forfeiture under a federal statute. On appeal the decision was reversed on the court's construction of 46 U.S.C.A. § 961(b). That section reads—"The interest of the mortgagee in a vessel of the United States covered by a mortgage, shall not be terminated by the forfeiture of the vessel for a violation of any *law of the United States,* unless the mortgagee authorized, consented, or conspired to effect the illegal act, failure, or omission which constituted such violation." (Italics supplied.)

It was held that the phrase "the interest of the mortgagee" could not by the context of the Act as a whole be limited to the interest of a *preferred mortgagee* because the Merchant Marine Act of 1920, as well as the present Ship Mortgage Act in title 46, dealt with both ordinary and preferred mortgages. See also Brock v. Angeron, 1944, La.App., 16 So.2d 93, 96. A close comparison of the several sections of the original Act of 1920, contained in 41 Stat. 1000 et seq., particularly 1004, seems to make the question of construction at least debatable. But I know of no contrary federal decision and no sufficient reason for not here giving effect to that decision of the 9th Circuit. The Maberhex, D.C. R.I., 1925, 6 F.2d 415, seems to be to the same effect. But it will be noted that in The Mariam, supra, the court was dealing with a forfeiture under a federal statute and the section of the Ship Mortgage Act, 46 U.S.C.A. § 961(b), in terms only preserves the mortgage from destruction by virtue of a forfeiture of the vessel "for a violation of any law of the United States". It seems to me that with respect to the particular situation it may well be held that there is a substantial difference between the effect of a forfeiture under a federal statute and under a State statute. The preservation of maritime liens against destruction by a forfeiture is the result of the application of the general principles of maritime law which have been in effect from time almost immemorial and applied by the admiralty courts. The exemption from destruction by forfeiture given by sec. 961(b) results from a purely statutory provision enacted by Congress with respect to the effect of violations of federal laws. Just as Congress has the power to originally provide appropriate remedies for violation of federal laws, so it has equal power to carve out exceptions with regard to the incidents of such violations. See Robinson on Admiralty, p. 454.

There is another reason in this case which I think supports the view that the mortgage was not saved from the effects of the forfeiture. An ordinary ship mortgage does not constitute a maritime lien. The J. E. Rumbell, 148 U.S. 1, 16, 19, 13 S.Ct. 498, 37 L.Ed. 345; Bogart v. The John Jay, 17 How. 399, 15 L.Ed. 95; The Emma Giles, D.C.Md., 15 F.Supp. 502; The Mariam, 9 Cir., 66 F.2d 899; while a preferred ship mortgage is expressly given the status of a maritime lien by 46 U.S.C.A. § 951. The legal concept of an ordinary mortgage puts the title to the property in the mortgagee although the mortgagor retains possession. In this case, therefore, the mortgagee was the title owner. And under the facts of the particular case not only was he the legal title owner but in the financial sense he was practically the whole owner except for the beneficial use of the vessel. He supplied the whole purchase price for the boat. It has generally been held that a forfeiture of the vessel by governmental authority destroys the interest of even an innocent owner; Harmony v. United States, 2 How. 210, 233, 11 L.Ed. 239; The Ella, D.C.Fla., 9 F.2d 411; The Pilot, 4 Cir., 43 F.2d 491; and the same holding has been made with respect to the interest of a conditional vendor, The Olympia, D.C.Conn., 1932, 58 F.2d 638; and of a mortgagee, The Cherokee, D.C.Tex., 292 F. 212 and United States v. One Saxon Automobile, 4 Cir., 257 F. 251. See also United States v. One Ford Coupe Automobile, 272 U.S. 321, 332, 333, 47 S.Ct. 154, 71 L.Ed. 279. It becomes unnecessary to consider the priorities between the mortgage and the liens or to decide, as contended for by counsel for the mortgagee, that even though the mortgagee had no maritime lien he could participate in the remainder of the fund for distribution after satisfaction of the lien claims.

It is unnecessary in this case to consider the relative priority of the two lien claims. They arose within a very short time prior to the seizure of the ship and were themselves largely contemporaneous. There is no basis for considering laches in their enforcement. In the case of a small Chesapeake Bay boat like that here involved, the so-called six months or calendar year rule with respect to lien claims seems applicable. See the discussion in Todd Shipyards Corp. v. The City of Athens, D.C.Md., 1949, 83 F.Supp. 67, where it was held that the voyage rule was the one to be applied ordinarily in cases of transatlantic voyages. As the present estimated value of the boat is $1,200, it appears probable that the net proceeds of the sale will be amply sufficient to pay in full both lien claims with interest.

In summary, therefore, my conclusions of law are as follows: (1) The ship must be sold to pay the lien claims of Bard and Oliver McCready (for supplies); (2) Out of the net proceeds of sale these two claims with interest should be paid; (3) The surplus, if any, should be paid to the Tidewater Fisheries of Maryland. Or, if the parties so agree, the boat can be retained by the latter upon payment of the lien claims, and costs.

Counsel are requested to promptly submit the appropriate decree.